[Civ. No. 20257.   Second Dist., Div. Two.   Dec. 30, 1954.]

CLAIRE F. BOHN, Appellant, v. D. D. WATSON, as Real Estate Commissioner, etc., Respondent.

S. V. O. Prichard and Oliver O. Clark for Appellant.

Edmund G. Brown, Attorney General, and Lee B. Stanton, Deputy Attorney General, for Respondent.

FOX, J.—This is an appeal from a judgment denying an application for a writ of mandate.

The petitioner (hereinafter designated Bohn) was a licensed real estate broker for more than 20 years. On December 18, 1951, an accusation was filed with the Real Estate Commissioner charging her with a violation of the provisions of sections 10177.5 and 10177, subdivision (f), of the Business and Professions Code. Two specific charges are set out in the accusation.

One charge alleges that on July 15, 1951, a final judgment by default was entered against Bohn and others by the Superior Court of Los Angeles County in a matter numbered Pasadena C-3615 and entitled "William E. Elliott (an incompetent person) by Edith Lamm (Guardian of his Person and Estate) v. Claire F. Bohn, et al.," and that this judgment was based upon the grounds of fraud, misrepresentation and deceit with reference to a transaction for which a real estate license was required. The other charge relates to a matter similarly entitled, bearing the number Pasadena C-3352, and alleges that after the filing of said suit, a stipulation permitting plaintiff to take judgment was signed and filed on August 10, 1951; that pursuant to said stipulation, a final judgment was entered therein against Bohn on August 15, 1951; that said judgment is based upon a complaint alleging Bohn's fraud, misrepresentation and deceit in a transaction for which a real estate license was required.

Bohn filed an answer to the accusation admitting that the two judgments referred to therein had been entered against her and that she had signed a stipulation that she had committed fraud in connection with case C-3352 but denying that she was in fact guilty of fraud, misrepresentation or deceit with respect to either transaction. By way of affirmative defense, she alleged that she did not file any answer in case No. C-3615 because of her intent to pay the monies claimed and to spare the expense of litigation to plaintiff

therein; and that her consent to the stipulated judgment in case No. C-3352 was motivated by her desire to assure plaintiff that his collection of the monies sued for would not be barred by any proceeding in bankruptcy. The statute of limitations was not raised by the said answer. No objection was made at any time to the form of the accusation and was thereby waived (Gov. Code, § 11506, subd. (b)).

The matter was heard before a hearing officer in two sessions. Testimony was taken from Bohn and from 12 witnesses called in her behalf. The complaint and default judgment in civil case No. 3615 (hereafter sometimes denominated the Albert's Motel transaction) was introduced in evidence, together with a 68-page deposition of Bohn taken in connection therewith. There was also received in evidence the complaint, stipulation and judgment in civil action No. 3352 (hereafter sometimes designated as the St. Andrews transaction). After the termination of the hearing, the Real Estate Commissioner found, with respect to the Albert's Motel transaction, that a default judgment was entered against Bohn which provided that plaintiff therein recover $42,974.09 on the first cause of action, which was based on fraud, misrepresentation and deceit, and a concurrent judgment of similar amount, together with interest, costs and attorney's fees on the second cause of action. With respect to the St. Andrews transaction, it was found, in brief, that pursuant to a written stipulation signed by Bohn and her counsel (more fully adverted to in a subsequent division of this opinion) judgment was entered in favor of plaintiff for $12,418.27 on his fourth cause of action, which was based on Bohn's fraud, deceit and false representations in securing the assignment to her of a note and deed of trust. The commissioner also found that the above judgments were unpaid; that the transactions upon which the above judgments were based were not transactions for which a real estate license was required; and that Bohn acted and conducted herself in a manner which would have warranted the denial of her application for a real estate license. Bohn's license was thereupon ordered revoked for violation of section 10177, subdivision (f), of the Business and Professions Code.*

*Business and Professions Code, section 10177, reads in part:
"The commissioner may suspend or revoke the license of any real estate licensee, who within three years immediately preceding, has done any of the following . . .
"(f) Acted or conducted himself in a manner which would have warranted the denial of his application for a real estate license."

Bohn petitioned the superior court for a writ of mandate to compel the commissioner to cancel his order revoking her license and to reinstate her as a real estate broker. No reference is made in the petition to any statute of limitations. The cause was submitted upon the record of the proceedings before the commissioner, together with the pleadings and briefs. In her opening brief, Bohn raised for the first time the issue of the three year statute of limitation contained in Business and Professions Code, section 10177, with respect to the Albert Motel transaction. After a review of the administrative record, the trial court sustained the action of the commissioner, upon findings which will hereafter be more particularly discussed.

Since one of Bohn's principal contentions is that there was no substantive evidence to support certain of the material findings and the judgment of the trial court, it will be sufficient to state the evidence which supports the findings and judgment, in accordance with the settled rule that an appellate court will not resolve significant conflicts in the evidence or draw inferences contrary to those reasonably drawn by the trial court. The record shows that in 1946 Bohn became acquainted with William E. Elliott, who was then about 80 years old. Mr. Elliott was introduced to Bohn through a member of the Christian Science Church to which Bohn also belonged and in which Elliott worshiped. Shortly thereafter Bohn acted as Elliott's agent in the purchase of a residence on St. Andrews Place, in Los Angeles, for which Elliott paid $19,000 in cash. Elliott lived there for about a year and then sold this property, Bohn once again acting as Elliott's broker. The sale was made to a Mrs. Pearl Bernsen (sometimes referred to as Bernstein), also a member of the same Christian Science Church to which Bohn belonged and Elliott attended. The price was $18,000, with $4,000 paid in cash, the balance covered by a note secured by a 4 per cent deed of trust payable at $75 per month. Elliott continued to reside in the St. Andrews home as a roomer for several months, until he found new quarters in the same neighborhood.

The friendship between Bohn and Elliott ripened in the succeeding months. In her deposition, Bohn stated she occasionally called at Elliott's home "to take him to church or a lecture or something." She testified she accompanied him on two occasions to his safe deposit box. The first visit was to deposit therein the trust deed received on the sale of the

St. Andrews property; the second so that Bohn might examine some insurance which Elliott feared might have been cancelled. Bohn also stated in her deposition that Elliott repeatedly told her he had made some provision for her in his will without disclosing the extent thereof.

### The Albert's Motel Transaction

In about September, 1947, Natalie Chamberlain and her husband, friends of Bohn, were owners of Albert's Motel, a 22-unit property with living quarters for the owner. The Chamberlains were seeking a loan in order to facilitate the consummation of a trade of Albert's Motel for a motel in Monrovia, California, known as Motel 66, owned by Frank Calkins and Amy Smee, who afterwards married. Acting as agent for the Chamberlains, Bohn procured a loan of $40,000 from Elliott, secured by a first deed of trust on Albert's Motel. Bohn received a substantial commission for her services. She testified Elliott had previously told her he had about $40,000 in liquid assets which he wished to invest and asked her to find a suitable investment. She stated Elliott visited Albert's Motel twice, and looked about for three hours, before making the loan. Thereafter, the Chamberlains conveyed Albert's Motel and some cash to the Calkinses in exchange for Motel 66.

Bohn testified that in July, 1948, the Calkinses informed her they desired to sell Albert's Motel. She stated that while she was visiting at the motel with Elliott, Mrs. Calkins chanced to remark that Bohn ought to buy the motel herself, but Bohn protested she had no money. Thereupon, Mr. Elliott also urged that she buy the motel and met her objection that she lacked funds with the proposal, "Why don't you use my money?" Bohn stated that for several weeks thereafter she resisted Elliott's oft-repeated suggestion that she buy the motel. At last she yielded. Since Elliott himself had no ready cash, Bohn suggested that Elliott subordinate his first deed of trust, on which a balance of about $37,500 was then due, to a third deed of trust, which would enable her to arrange the financing necessary to make the purchase. She stated Elliott agreed to this plan.

About August, 1948, the sale of the motel from Calkins to Bohn was completed through escrow for $142,500. Bohn paid the Calkinses about $40,000 in cash, from money which she derived by a loan. The lender was given a first deed of trust for $40,000, while the Calkinses took back a second

deed of trust for $65,000 for the balance of their equity. Elliott thereby became the junior encumbrancer, his interest now evidenced by Bohn's promissory note for $41,059, secured by a third deed of trust. This increase of approximately $3,500 in the amount formerly secured by the first deed of trust represented funds advanced by Elliott to Bohn to enable her to close the escrow. Bohn asserted that when Elliott consented to change his encumbrance from a first to a third deed of trust, she expressed her opinion to him that the property had a value of $160,000.

Bohn held the property from August to December, 1948, at which time she sold the property to Joseph Wolpe and family for $148,500. The Wolpe family assumed all three mortgages totaling about $143,000 and paid Bohn the difference in cash. Bohn testified that she did not convey the property directly to the Wolpes, but transferred it first to Natalie Chamberlain, who immediately thereafter transferred it to the Wolpes. Bohn stated her only reason for first conveying to Mrs. Chamberlain was "it gave her (Mrs. Chamberlain) an opportunity to make a thousand dollars, and I let her have it."

After several other transfers, Albert's Motel was acquired by an owner who became delinquent in his payments. The holder of the second trust deed, one Johnson, communicated to Elliott's guardian that he would have to move to protect his interest. Thereafter, Johnson foreclosed his second deed of trust, wiping out Elliott's third trust deed.

In July, 1949, Edith Lamm was appointed guardian of Elliott's person and estate. On November 27, 1950, Elliott's guardian instituted action C-3615 against Bohn, Natalie Chamberlain and others. The complaint alleged two causes of action growing out of the Albert's Motel transaction. Neither Bohn nor Chamberlain filed an answer and Bohn's default was entered on December 12, 1950. On July 20, 1951, judgment was entered against Bohn and Chamberlain on the first cause of action in the sum of $42,974.09, and against Bohn alone on the second cause of action for the same amount, plus attorney's fees in the sum of $1,029. This latter judgment was declared to be concurrent with the judgment against Bohn on the first cause of action, to the extent thereof.

So far as they are material to the determination of questions presented by this appeal, we will here recite excerpts

from the first cause of action in the complaint, which were carried over into the trial court's findings in the instant matter. It is there alleged, and the trial court found, that Bohn and Mr. and Mrs. Chamberlain were closely associated in a series of real estate transactions during the latter part of 1947 and for about two years thereafter; that Bohn acted as their agent in negotiating a $40,000 loan from Elliott in September, 1947; that at that time, Elliott had more than $40,000 in conservative investments, principally government securities; that he was then 81 years old and of failing mental capacity; and that all this was known to Bohn and the Chamberlains; that Bohn and the Chamberlains conspired to defraud Elliott of his fortune; that Bohn, acting in concert with the Chamberlains, persuaded Elliott to liquidate more than $20,000 in U. S. government bonds and other securities and to loan Chamberlain $40,000, secured by a first deed of trust, on Albert's Motel, concealing from him the fact of Bohn's agency for the Chamberlains; that in furtherance of the scheme to defraud Elliott, the Chamberlains traded Albert's Motel to the Calkinses in exchange for Motel 66, the agreed price for Albert's Motel being set at $125,000; that further pursuing the scheme to defraud Elliott, Bohn opened an escrow to purchase Albert's Motel from the Calkinses for the sum of $142,500, title to be taken by Bohn subject to the first trust deed in favor of Elliott upon which the balance then due was $37,599.02, the sum of $39,940.98 to be paid in cash and the balance of $65,000 to be represented by a second purchase money trust deed.

The complaint also recites, and the court found, that at the time she entered this transaction, Bohn had no reasonable prospect of raising the cash down payment required except from Elliott; that pursuant to her scheme to defraud Elliott, she prevailed on him to take, in lieu of his first trust deed securing a balance of $37,599.02 on said motel, her note for $41,059 secured by a third trust deed; that the difference of $3,459.98 was paid by Elliott into escrow and paid by the escrow to Bohn; that by virtue of Elliott's release of his first trust deed, Bohn procured a loan of $40,000 from another party secured by a first trust deed on the motel; that out of the proceeds of this loan the Calkinses received $39,780.29; that Bohn represented to Elliott prior to his entering this transaction that Albert's Motel was worth in excess of the three contemplated encumbrances ($146,000) and that Elliott's security would not be impaired by the release of his

first trust deed position and acceptance of a third trust deed; that Bohn knew this representation was false, and knew the value of the motel would not exceed $105,000; and that Elliott was induced to enter into the transaction in reliance on this false representation, whereby Bohn obtained at least $39,106.85.

It is also alleged and found that in furtherance of the scheme to defraud Elliott, Bohn sold Albert's Motel to Natalie Chamberlain on December 23, 1948, for $148,500, subject to the three encumbrances totaling $143,278.72, and received from Mrs. Chamberlain $5,221.28 in cash; that on the same day, Mrs. Chamberlain sold the motel to the Wolpe group, subject to the above encumbrances, for $155,778.72, and received from them $7,500 in cash; that after a series of transfers of the property, a subsequent owner became delinquent in payment on the second trust deed then owned by W. R. Johnson; that said trust deed was foreclosed and the motel was sold at public auction to the highest bidder for the sum of $57,000; that by reason of the aforesaid sale, Elliott's security was extinguished and by reason of the conspiracy between Bohn and the Chamberlains, Elliott was defrauded in the sum of $39,106.85.

The court further found that in civil action C-3615, plaintiff alleged that Bohn "is and was an artful and designing person, and that she used her feminine wiles upon . . . Elliott to induce him to shift his investment, as aforesaid, and falsely led him to believe that she was romantically interested in him." The court found that the default judgment entered on the first cause of action was based on Bohn's misrepresentation, fraud and deceit.

We may pause here, before considering the St. Andrews transaction and reproducing other findings of the trial court, to deal with certain contentions advanced by Bohn. She argues that there is no basis for denying her relief in this proceeding apart from the court's erroneous assumption that the judgment in civil action C-3615 actually adjudicated her fraudulent conduct and its erroneous application of the doctrine of collateral estoppel. She urges that her own testimony clearly shows her innocence of wrongdoing. She points out that the record contains testimony that her default was entered while her attorney was in Washington, D. C., and that upon his return she conferred with him and told him that she was not guilty of the fraud therein charged; that she wished to pay the amount of the note but desired to avoid

the expense to Elliott's guardian and herself of a lawsuit; and that she allowed her default to stand upon advice of her attorney that the judgment to be entered would merely be a simple money judgment based on her debt to Elliott.

The vice of Bohn's approach is her fallacious premise that the court's determination may be sustained only by the invocation of the doctrine of collateral estoppel, which we may concede has no application here. But she overlooks that there is ample support in the evidence in addition to the judgment rendered against her in the civil action. ■ The rule is well settled that where a judgment has been entered upon a default, the essential allegations of the complaint upon which the judgment was entered are competent evidence in another proceeding as judicial admissions. (*Estate of McCarthy,* 127 Cal.App. 80, 87 [15 P.2d 223] ; *Fitzgerald* v. *Herzer,* 78 Cal.App.2d 127, 131 [177 P.2d 364] ; *Thiel* v. *Southern Pac. Co.,* 149 F.2d 783, 787; *Bonazzi* v. *Fortney,* 94 Vt. 263 [110 A. 439, 441] ; *Miller* v. *Journal Co.,* 246 Mo. 722 [152 S.W. 40, 42] ; 4 Wigmore on Evidence, 3d ed., §§ 1066, 1072, pp. 60, 79; 1 Greenleaf on Evidence, 16th ed., § 527a.)

■ By permitting her default to be entered, Bohn admitted the truth of all the material allegations in the complaint. (*Fitzgerald* v. *Herzer, supra.*) These admissions form the nucleus of the court's findings with respect to the motel transaction. They do not stand alone, however, for in the testimony given by Bohn in her deposition and from the evidence adduced at the commissioner's hearing, there emerged the entire pattern of events which culminated in the ultimate spoliation of a considerable portion of Elliott's substance. From the character of the dealings, the relation of the parties, the interlocking transactions between Bohn and the Chamberlains and the circumstances surrounding Elliott's involvement in the motel deal, the court might legitimately infer that Elliott was induced by the fraudulent representations of Bohn and by an abuse of the confidence he reposed in her by virtue of their close personal relationship to part with his money, thus becoming a victim of her scheme of self-enrichment at his expense. (*Hunter* v. *McKenzie,* 197 Cal. 176, 185, 186 [239 P. 1090] ; *Mathewson* v. *Naylor,* 18 Cal. App.2d 741, 744 [64 P.2d 979] ; *Lentz* v. *Hartman,* 43 Cal.App.2d 609, 613 [111 P.2d 404].) ■ It is well established that since direct proof of fraudulent intent is often an impossibility because of the clandestine nature of a wrong-

ful undertaking, proof indicative of fraud may come by inference from circumstances surrounding the transaction and the relationship and interest of the parties thereto. (*Fross* v. *Wotton*, 3 Cal.2d 384, 393 [44 P.2d 350]; *McNulty* v. *Copp*, 91 Cal.App.2d 484, 490 [205 P.2d 438]; *Taylor* v. *Osborne-Fitzpatrick Fin. Co.*, 57 Cal.App.2d 656, 661 [135 P.2d 598].) ▪ It is equally true that a reasonable inference drawn from circumstantial evidence may be believed as against direct evidence to the contrary. (*Scott* v. *Burke*, 39 Cal.2d 388, 398 [247 P.2d 313]; *Gray* v. *Southern Pac. Co.*, 23 Cal.2d 632, 640-641 [145 P.2d 561]; *Barham* v. *Widing*, 210 Cal. 206, 215 [291 P. 173].)

▪ Bohn was entitled to and did testify, in explanation, that she submitted to the default judgment because of the advice of counsel that it would not affect her license and because of various other considerations, including her desire to pay a just debt and avoid the expense of litigation. She also gave her version of the transaction in a manner exculpatory of her motives and in fortification of her innocence of wrongdoing. Many witnesses testified in her behalf on the issues involved. But these were items of evidence to be considered by the trier of fact against the background of her conduct in the transaction and the character of her admissions in suffering the default judgment. In passing on this conflicting evidence, the trial court's finding that Bohn engaged in a course of dishonest and fraudulent conduct toward Elliott finds abundant support in the record revealing the motel transaction and the admissions upon which the default judgment were based. Much of the picture there presented is one of an apparently unscrupulous person taking advantage of an elderly man plainly incapable of looking after his own affairs. How else, to cite but one example at this point (others will be manifest in the narration of the St. Andrews transaction), can one explain Elliott's changing from a first to a third trust deed position on property which apparently was encumbered to its full value? It will be recalled that the motel brought only $57,000 at the foreclosure sale by the holder of the second trust deed. Few lenders, of course, would normally be satisfied with collateral of little or no greater value than the amount loaned, since it lacks the margin of security needed in the event of market fluctuations.

Bohn stoutly maintains that the judgment in case C-3615 does not adjudicate her guilty of any wrongdoing. She asserts that the claim there alleged is simply one arising

from her agreement to pay Elliott a stated sum, as evidenced by her promissory note. The record refutes this. The com- plaint alleges two causes of action, the first founded on fraud, as the allegations we have hitherto set out clearly establish, and the second based on a promissory note given as a concomitant of the fraudulent transaction. That the judgment is predicated on fraud patently appears since it decrees that plaintiff recover jointly from Bohn and Natalie Chamberlain the sum of $42,974.09 on plaintiff's *first cause of action,* which alleged the transaction based on the fraud of *both* of these defendants; on the second cause of action, which stated the contract count, recovery is decreed from Bohn *alone* in the above amount, to which is added the sum of $1,029 as attorney's fees as provided in the note. ''There- fore, it cannot be said that the judgment is not predicated on fraud, or that the liability on that basis was abandoned.'' (*Wilson* v. *Walters,* 19 Cal.2d 111, 122 [119 P.2d 340].) In the Wilson case the court effectively disposes of a con- tention virtually identical with that raised by Bohn.

Bohn argues that the allegations of fraud and conspiracy were not material or essential to the judgment as rendered and added nothing to it; hence, it is claimed, these allegations were neither admitted by her default nor adjudicated in that judgment. This is a mistaken conception. The root and origin of a liability becomes of extreme importance, to give but one example, in determining the effect of any sub- sequent discharge in bankruptcy of the judgment debtor. With respect to those liabilities not included in a discharge in bankruptcy, section 35 of the Federal Bankruptcy Act, title 11, U.S.C.A., as amended, June 22, 1938, provides: ''a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, . . . except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false representations.'' The significance of the assertion of lia- bility based on fraud is demonstrated in *Wilson* v. *Walters, supra,* where the court stated (pp. 120-121) : ''When prop- erty or money has been obtained by fraudulent representa- tions and the remedy for the liability thereby created may be predicated on either contract or tort (fraudulent representa- tions), such liability is not cancelled by a discharge in bank- ruptcy even though the creditor makes his claim on contract rather than on fraud in the bankruptcy proceedings and the claim is allowed. He is still entitled to recover the dif- ference between the amount received on the allowance and the

damages actually suffered. There is no waiver of tort liability.'' (See also *Zimmern* v. *Blount*, 238 F. 740, 745.) It was with this eventuality in mind that the following sage counsel has been given: ''Any person suing upon a cause of action is bound to anticipate that bankruptcy may intervene, and should draw the pleadings, upon which his cause of action is based, so that it will appear not dischargeable, if he wishes any judgment entered in that particular case to be free from the stay of the bankruptcy court while the discharge matter is pending.'' (*In re Lusch*, 251 F. 316, 317. See *Fitzgerald* v. *Herzer*, 78 Cal.App.2d 127, 130 [177 P.2d 364].) That the allegations of fraud in the first cause of action were far from superfluous is thus too palpable to admit of dispute.

■ Plaintiff had two independent, but consistent causes of action, a suit on the note and a cause of action growing out of fraud, and under approved procedure was entitled to pursue both until satisfaction was had. (*Williams* v. *Marshall*, 37 Cal.2d 445, 457 [235 P.2d 372]; *Perkins* v. *Benguet Consol. Min. Co.*, 55 Cal.App.2d 720, 755 [132 P.2d 70]; *Zimmern* v. *Blount, supra.*)

Equally untenable is Bohn's contention that count one of the accusation (the Albert's Motel transaction) is barred by the three-year limitation period imposed by section 10177, subdivision (f), of the Business and Professions Code. This defense was not raised in the administrative proceedings (nor, for that matter, is it mentioned in the petition for the writ of mandate). ■ It is well established that the statute of limitations is a personal privilege which is waived unless asserted at the proper time and in the proper manner, whether it be a general statute of limitations or one relating to a special proceeding. (*Hall* v. *Chamberlain*, 31 Cal.2d 673, 679-680 [192 P.2d 759]; *Sheeter* v. *Lifur*, 113 Cal.App.2d 729, 739 [249 P.2d 336]; 16 Cal.Jur., 603-604.) This general rule applies to proceedings before an administrative tribunal. (*California Emp. Com.* v. *MacGregor*, 64 Cal.App.2d 691, 693 [149 P.2d 304]; 42 Am.Jur., Public Administrative Law, § 236, pp. 675-676.) ■ There is no merit in Bohn's assertion that merely because the court made findings upon this issue, which was raised for the first time in Bohn's brief to the court, this issue was validly injected into the case. The attorney general points out that he prepared findings relative to the tolling and extension of the limitations period in ''an excess of caution'' because Bohn purported to raise such issues in her brief to the trial court. ■ But as they were not part

of the issues raised or adjudicated in the administrative hearing, the findings thereon were immaterial and wholly surplusage. (*Central H. Imp. Co.* v. *Memorial Parks,* 40 Cal.App.2d 591, 611 [105 P.2d 596]; *Lucy* v. *Lucy,* 22 Cal. App.2d 629, 635 [71 P.2d 949]; *Spencer* v. *Deems,* 43 Cal.App. 601, 606 [185 P. 671].) ▮ It is fundamental that the review of administrative proceedings provided by section 1094.5 of the Code of Civil Procedure is confined to the *issues* appearing in the record of that body as made out by the parties to the proceedings, though additional *evidence*, in a proper case, may be received. (2 Cal.Jur.2d, Administrative Law, pp. 309, 408.) ▮ It was never contemplated that a party to an administrative hearing should withhold any defense then available to him or make only a perfunctory or "skeleton" showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court. (*Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790, 799 [136 P.2d 304].) The rule compelling a party to present all legitimate issues before the administrative tribunal is required in order to preserve the integrity of the proceedings before that body and to endow them with a dignity beyond that of a mere shadow-play. Had Bohn desired to avail herself of the asserted bar of limitations, she should have done so in the administrative forum, where the commissioner could have prepared his case, alert to the need of resisting this defense, and the hearing officer might have made appropriate findings thereon. "Having failed to raise the defense of the statute of limitations before the commission, the appellant waived his right to that personal defense." (*California Emp. Com.* v. *MacGregor,* 64 Cal.App.2d 691, 693 [149 P.2d 304]; 42 Am.Jur., Public Administrative Law, § 236, pp. 675-676.)

### The St. Andrews Transaction

About 10 months after Elliott relinquished his first trust deed for a third trust deed on Albert's Motel, another transaction took place between Bohn and Elliott. The subject of this transaction was the note and trust deed received by Elliott from the sale of his St. Andrews Street home to Mrs. Bernsen through Bohn's agency. Early in June, 1949, the amount due on the note was $13,418.27, payable in installments of $75 per month, including interest of 4 per cent per annum. At about this time, the United States government was asserting a tax claim of some $9,000 or $10,000 against

Elliott. Bohn testified in her deposition that she was aware of this fact; she also knew that Elliott had tried to raise money by discounting the note. She testified that Elliott told her he had been offered only $7,500 for the note. Bohn testified that she told Elliott that Mrs. Chamberlain would give him $9,000 for the note and trust deed, payable out of an escrow she anticipated would soon close. Thereupon Elliott assigned the note and deed of trust to Bohn, who in turn gave Elliott her own note for $8,000. This note was unsecured, bore no interest, had no provisions for any monthly payments and was not due for three years.

Bohn next took the note and deed of trust assigned to her by Elliott and pledged it as security for a loan of $5,000 from Mrs. Eisenman. Of this sum, Bohn gave Elliott $1,000, gave Mrs. Chamberlain $1,000 and retained the balance for herself.

On February 1, 1950, Elliott's guardian filed civil action C-3352 against Bohn and others entitled "Complaint for Cancellation of Assignment of Trust Deed and Damages for Fraud, Appointment of Receiver." It contained four counts, the first for the appointment of a receiver and the second and third for rescission based on lack of consideration and Elliott's mental incapacity. The fourth cause of action, which is here germane, set out the circumstances of the assignment of the note and deed of trust, alleging that on the date of the assignment, Elliott was 84 years old and suffering from mental weakness brought on by old age. It further alleged that Bohn procured said assignment by representing to Elliott that she would immediately make available to him $9,000 with which to pay the tax claim being asserted against him; that this representation was known by Bohn to be false and made with intent to deceive Elliott and induce him to make the transfer, which he then made in reliance thereon; that Bohn thereafter failed to make available the promised funds. There was thus pleaded a complete and sufficient count in fraud in the fourth cause of action.

Bohn's answer denied all of the allegations of fraud, but after it was filed she and her attorney entered into a written stipulation with plaintiff dated March 21, 1951. The stipulation recited that in the event Bohn, within 45 days, redelivered the note and deed of trust together with $792.25, plus any amounts of principal and interest paid after the date of the stipulation, the action would be dismissed; otherwise, "plaintiff may take judgment *on his fourth cause of action* for the sum of $12,418.27" plus interest and costs.

(Emphasis added.) The form of judgment was agreed upon in this stipulation, which was subsequently filed. At about the same time Bohn and her attorney each signed another document entitled "Stipulation," which was never filed in the civil action, but was introduced in evidence before the commissioner. This document reads in part:

"I

"That the allegations of plaintiff's fourth cause of action are, and each of them is, true.

"II

"That the transfer of the note secured by trust deed described in plaintiff's complaint from said WILLIAM E. ELLIOTT to defendant, CLAIRE F. BOHN *was procured through the fraud and false representations knowingly and fraudulently made by defendant,* CLAIRE F. BOHN, and relied upon by plaintiff, WILLIAM E. ELLIOTT, while said defendant, CLAIRE F. BOHN, *was acting in a fiduciary capacity* toward said WILLIAM E. ELLIOTT.

"III

"This stipulation may be filed in any voluntary or involuntary bankruptcy proceeding of CLAIRE F. BOHN hereafter commenced under the Bankruptcy Act as amended." (Emphasis added.)

Bohn failed to reassign the note or trust deed, and on August 13, 1951, judgment was entered pursuant to the stipulation filed.

The trial court found substantially in accord with the allegations of fraud in the assignment to Bohn of the note and deed of trust as set out in the fourth cause of action, and found specifically that said cause of action was based upon fraud, deceit and false representations by Bohn in securing said assignment. There is patently no substance in Bohn's argument that these findings are unsupported by the evidence and that the judgment rendered in case C-3352 was merely based on the theory of rescission of a contract for failure of consideration. Bohn specifically stipulated to a judgment on the *fourth cause of action,* the only count in which the fraud relating to the St. Andrews transaction is alleged with meticulous detail. Under such circumstances, the allegations of fraud therein contained were embraced within the stipulation and became the foundation of the judgment predicated thereon. (*Wilson* v. *Walters,* 19 Cal.2d 111, 120, 122 [119 P.2d 340].) Furthermore, the court in

the instant matter had before it the writing in which Bohn specifically admitted that "the allegations in plaintiff's fourth cause of action are . . . true" and that she procured the transfer of the note and trust deed through false representations while she occupied a fiduciary status toward Elliott. This extrajudicial statement was competent evidence as an admission against interest under well established principles. (Code Civ. Proc., § 1870, subd. 2.) All this, coupled with the unconscionable circumstances under which Bohn obtained the note and her callousness in using it to obtain funds, four-fifths of which were divided between Mrs. Chamberlain and herself, provide ample support for the findings attacked.

### Evaluation of the Record

We need not dwell at length upon Bohn's explanations that she suffered judgment to be taken in one case by default and stipulated to judgment in another in order to preserve Elliott's estate from further depletion and to perpetuate his claim against the possibility of discharge by bankruptcy. These statements come illy from one whose financial depredations had already severely plundered her victim. Were these transactions as innocent or legitimate as Bohn now claims them to have been, it might be expected that she would have had available less compromising means of adjusting her indebtedness. Her testimony, and that of her attorney, shows that she was at all times cognizant of the jeopardy in which she would place herself as a licensee by a voluntary confession of fraud; she made her choice, she states, upon the advice of both her counsel and her conscience, in the belief that the probity of her motives would be recognized upon any subsequent disciplinary proceeding. But not only her admissions and stipulations, but the circumstances of her transactions with Elliott, militate against her present claim that no element of fraud tinged or vitiated those dealings. Under the impact of these admissions and stipulations, the statutory presumption of innocence which Bohn seeks to invoke loses much of its vitality. We find sufficient basis, in view of the total record presented, for the court's finding that Bohn "acted and conducted herself in a fraudulent and dishonest manner, so that her reputation for dishonesty and untruthfulness would have warranted the denial of her application for a real estate broker's license" under section 10177, subdivision (f), of the Business and Professions Code. (*Karrell* v. *Watson,* 116 Cal.App.2d 769 [254 P.2d 651, 255 P.2d 464].) Taking into consideration the fla-

grance of Bohn's conduct (her imposition on an elderly man who reposed trust and confidence in her) and the magnitude of the loss sustained by Elliott (whose guardian secured judgments totaling $55,392.36 against Bohn), we cannot quarrel with the court's conclusion that no equitable grounds appeared for the issuance of a writ of mandate.

In her reply brief, Bohn argues that the accusation fails to state the facts of any wrongdoing sufficient to support this proceeding against her, citing *Manning* v. *Watson,* 108 Cal.App.2d 705 [239 P.2d 668]. However, the distinguishing elements found by this court in *Karrell* v. *Watson, supra,* p. 778, apply here with equal validity. The accusation specifically referred to the complaints in actions C-3615 and C-3352, charged that judgments had been obtained by default and stipulation respectively, and charged that the judgment in C-3615 was based on the grounds of fraud, misrepresentation and deceit, and that the transaction referred to in C-3352 was based on the same grounds. The nature, elements and character of the acts charged were thus not only clearly stated in the accusation, but included references to the complaints setting out the transactions in full. That Bohn was plainly apprised of the acts and conduct charged appears from her own answer, in which she herself referred to the transactions involved in the complaints, denied fraud in connection therewith, and expressed her intent to discharge her obligations arising therefrom.

Various other findings are objected to on the ground that they find no support in the evidence. It would be a work of supererogation to list them in detail, since the evidence we have stated sufficiently justified the trial court in making every material finding essential to its judgment. It is elementary law that if a judgment is amply supported by findings which are sustained by sufficient evidence, questions relative to other findings become immaterial upon appeal and may be disregarded. (*Logan* v. *Forster,* 114 Cal.App.2d 587, 602 [250 P.2d 730]; *American Nat. Bank* v. *Donnellan,* 170 Cal. 9, 15 [148 P. 188]; *Moore* v. *Mosher,* 88 Cal.App.2d 324, 325 [198 P.2d 714]; *Guild* v. *Stockton Ice Rink Co.,* 77 Cal.App.2d 17, 22-23 [174 P.2d 338].) Similarly, no merit attaches to Bohn's complaint regarding the court's conclusion of law that by the prior judgments she was collaterally estopped from denying that she acted fraudulently and dishonestly in the transactions therein referred to. The questioned conclusion was one of thirteen conclusions of law drawn by the trial court, which,

unfortunately, did not winnow the findings and conclusions prepared by counsel with that nice discrimination that would have eliminated all surplusage from the case. ██ However, it has been consistently held that a judgment will not be reversed because a conclusion is not legally sound, if the judgment is in fact a proper one. (*Spencer* v. *Duncan,* 107 Cal. 423, 426 [40 P. 549]; *Platner* v. *Vincent,* 194 Cal. 436, 444 [229 P. 24]; *Hammond Lbr. Co.* v. *Gordon,* 84 Cal.App. 701, 706 [258 P. 612]; *Fitts* v. *Mission Health etc. Shop,* 58 Cal.App. 362, 364 [208 P. 691].) As stated in *Spencer* v. *Duncan, supra,* in quoting from two decisions of the Supreme Court (pp. 426-427): " 'But we do not reverse for what we regard as *bad logic,* but for what we consider *bad law* . . . Where some of the conclusions of law in a decision are not properly drawn from the facts found this is no ground for reversing the judgment, if the ultimate conclusion upon which the judgment rests is not erroneous in view of the facts found.' " (Emphasis added.) This states the law here applicable.

Throughout Bohn's brief there are interpolated many drastic pronouncements suggestive of some hidden, underlying, and indeed, unconscious prejudice against her which prevented an unbiased consideration of the evidence. We feel that such criticism is unwarranted. Bohn herself testified *in extenso* and her deposition was introduced. She brought in 12 witnesses who testified in her behalf. Arrayed against her were not only the judgments, her admissions from the pleadings, her stipulation and her written statement of having acted fraudulently while bound by a fiduciary relationship, but the damaging nature and circumstances of the transactions themselves. All this conflicting mass of evidence was weighed by the trial judge in his independent review of the record, and, drawing reasonable inferences therefrom, he found against her. Contrary to her assertion, Bohn has had her day in court, and though it may have been marred by an adverse judgment, this result would appear to stem from the infirmities of her case rather than from any latent hostility of the triers of the facts.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 24, 1955.