[Civ. No. 26988. Second Dist., Div. Two. Dec. 4, 1963.]

FRANK EPSTEIN, Plaintiff and Respondent, v. CALIFORNIA HORSE RACING BOARD et al., Defendants and Appellants.

Stanley Mosk, Attorney General, and Conrad Lee Klein, Deputy Attorney General, for Defendants and Appellants.

O'Melveny & Myers, Sidney H. Wall, Kevin O'Connell and Donald M. Wessling as Amici Curiae on behalf of Defendants and Appellants.

Apple & Cohen, Irving D. Apple and Theodore A. Cohen for Plaintiff and Respondent.

HERNDON, J.—This is an appeal from the judgment of the superior court granting respondent a peremptory writ of mandate commanding appellant California Horse Racing Board to set aside its decision and order of March 19, 1962,

by which it determined that respondent should not be granted permission to engage in parimutuel wagering and should not be permitted access to racing enclosures within its jurisdiction.

█ Initially, it should be noted that, contrary to respondent's contentions, the proceeding before the court below did not constitute a trial *de novo*. Its findings, therefore, are not binding upon this court on appeal. (Cal. Const., art. IV, § 25a; *Shepherd* v. *State Personnel Board*, 48 Cal.2d 41, 46 [307 P.2d 4] ; *Flores* v. *Los Angeles Turf Club, Inc.*, 55 Cal.2d 736, 745-747 [13 Cal.Rptr. 201, 361 P.2d 921].)

█ In reviewing the board's decision it was not within the province of the superior court to reweigh the evidence; its sole function was to determine from a review of the record whether or not there was any substantial evidence tending to support the board's findings. If there *was* such evidence, the board's findings and decision should be upheld. (*Shepherd* v. *State Personnel Board, supra,* 48 Cal.2d 41, 46; *Covert* v. *State Board of Equalization,* 29 Cal.2d 125, 131 [173 P.2d 545] ; *Rudolph* v. *Athletic Commission,* 177 Cal.App.2d 1, 6-8 [1 Cal.Rptr. 898].)

"The courts, both trial and appellate, are bound in cases of this kind by the substantial evidence rule, and may not reweigh the evidence or pass on the credibility of the witnesses, or resolve the conflicting testimony contrary to the Department's findings. All legitimate and reasonable inferences must be indulged in support of the Department's decision. [Citations.]" (*Mundell* v. *Department of Alcoholic Beverage Control,* 211 Cal.App.2d 231, 233 [27 Cal.Rptr. 62].) The reviewing court is "bound to disregard the evidence contrary to that received in support of the findings of the board." (*Thompson* v. *City of Long Beach,* 41 Cal.2d 235, 241 [259 P.2d 649].) It may not assess the credibility of the witness (*Benedetti* v. *Department of Alcoholic Beverage Control,* 187 Cal.App.2d 213, 216 [9 Cal.Rptr. 525]), and in fact must bear in mind that "a trier of fact is not required to accept as true the uncontradicted testimony of a witness, but in the light of his interest and motives may disbelieve his testimony even though it is not directly contradicted." (*Burako* v. *Munro,* 174 Cal.App.2d 688, 692 [345 P.2d 124].)

█ Respondent makes a "parenthetical" contention that Business and Professions Code, section 19572, authorizing the board to promulgate certain exclusionary rules, and section 2001 of the California Administrative Code, title 4,

chapter 4, article 41 (hereinafter referred to as "Administrative Code"), promulgated by the board in the exercise of this authority, constitute an unconstitutional delegation of legislative power.

This contention must be rejected because "it is no longer open to question that the Legislature (in Bus. and Prof. Code, §§ 19420, 19561) and the state Constitution (art. IV, § 25a) have, in the exercise of the state's conceded police power to regulate race tracks, validly delegated plenary rule-making power to the racing board. ..." (*Flores* v. *Los Angeles Turf Club, supra,* 55 Cal.2d 736, 741; see also *Sandstrom* v. *California Horse Racing Board,* 31 Cal.2d 401, 412-413 [189 P.2d 17, 3 A.L.R.2d 90].)

█ Likewise without merit is respondent's assertion that section 19572 (originally enacted in 1951 as § 19561.5) indicates the absence of a legislative intent that acts committed prior to the effective date thereof might be considered in applying its provisions. As noted in *Pitts* v. *Perluss,* 58 Cal. 2d 824, 836 [27 Cal.Rptr. 19, 377 P.2d 83], this regulation does not impose new legal sanctions upon past actions, but imposes standards for the future operation of the regulated activity. Further, neither the language of the section, nor the provisions of related sections which provide for hearings to determine applicability of the rules to otherwise affected persons, is comparable to section 13207 of the Education Code considered in *DiGenova* v. *State Board of Education,* 57 Cal. 2d 167, 175-176 [18 Cal.Rptr. 369, 367 P.2d 865], and relied upon by respondent.

In addition, bookmakers had been excluded under the rules adopted by the board since its creation in 1933 (Stats. 1933, ch. 769, p. 2046), although no express statutory authority therefor existed. When it was held in *Orloff* v. *Los Angeles Turf Club,* 36 Cal.2d 734 [227 P.2d 449], that this power to exclude persons extended only to those guilty of unlawful conduct on the track itself, the Legislature immediately enacted section 19561.5 (now §§ 19572 and 19573) confirming the power previously exercised by the board. Clearly, then, the Legislature has indicated its intent to permit precedent conduct to be considered by the board in determining which persons should be permitted in the future to engage in parimutuel betting. █ Finally, since respondent did not object to the introduction of evidence concerning his conduct prior to 1951 at the hearing, he may not complain thereof for

the first time upon appeal. (*Bohn* v. *Watson,* 130 Cal.App.2d 24, 37 [278 P.2d 454].)

Horse racing in California is governed by the provisions of the Horse Racing Law, Business and Professions Code, sections 19400-19663. Section 19572 provides: "The board may, by rule, provide for the exclusion or ejection from any inclosure where horse races are authorized, or from specified portions of such inclosure, of any known bookmaker, known tout, person who has been convicted of a violation of any provision of this chapter or of any law prohibiting bookmaking or any other illegal form of wagering on horse races, or any other person whose presence in the inclosure would, in the opinion of the board, be inimical to the interests of the State or of legitimate horse racing, or both. No such rule shall provide for the exclusion or ejection of any person on the ground of race, color, creed, or sex."

Pursuant to this section, the board has adopted Administrative Code, sections 2000-2011. Section 2001 prohibits certain classes of persons from participating in parimutuel wagering; sections 2000 and 2003 require racing associations to exclude from their tracks the classes of persons so prohibited. Subdivision (a) of section 2001 bars from parimutuel betting "Persons who have engaged in bookmaking, touting, or illegal wagering", and subdivision (e) bars "Persons who have been convicted of violating any of the provisions of sections 337a ... of the Penal Code." It is conceded that respondent was convicted of violating section 337a, Penal Code, in 1939.

The relevant facts may be summarized as follows: On January 10, 1962, respondent was refused admission to Santa Anita Park on the ground that he was among the classes prohibited from entering racing enclosures and participating in parimutuel betting. On January 12, 1962, respondent sought a hearing before the board to determine his status in accordance with the provisions of section 19573, Business and Professions Code, and section 2007, Administrative Code. This hearing was held on March 19, 1962. Four days prior thereto, apparently upon ex parte motion, respondent's motion to dismiss the information and terminate the probation in connection with his conviction of a violation of section 337a, Penal Code, was granted in accordance with section 1203.4 of the Penal Code.

Therefore, the first issue presented for our consideration is whether the action of the court in releasing respondent "from all penalties and disabilities resulting from the

offense or crime of which he has been convicted'' (§ 1203.4) prohibits an administrative agency charged with the regulation of an activity affected with a public interest from considering *the fact* of respondent's conviction in determining the applicability of its rules.

Respondent, of course, does not contend that in this instance the dismissal granted under section 1203.4 operated retroactively so as to render improper his exclusion from the racetrack two months prior to its effective date. Section 1203.4 of the Penal Code expressly provides:

''[T]he court shall thereupon dismiss the accusations or information against such defendant, who shall *thereafter* be released from all penalties and disabilities resulting from the offense or crime of which he has been convicted.'' (Italics added.) It is therefore conceded that as of January 10, 1962, the Los Angeles Turf Club was privileged to, indeed, obligated to, exclude respondent from the premises on the basis of his prior conviction alone. (*Flores* v. *Los Angeles Turf Club, supra,* 55 Cal.2d 736, 748.)

The nature of the ''penalties and disabilities'' referred to in section 1203.4 was analyzed at length in *In re Phillips,* 17 Cal.2d 55, 60-61 [109 P.2d 344, 132 A.L.R. 644], in reference to the disbarment of an attorney. It was therein declared:

''It is contended that the order granting probation followed by an order dismissing the action under Penal Code, section 1203.4, is analogous to an order granting a new trial or to the reversal of a judgment of conviction upon appeal, and that a judgment of conviction cannot be final so long as the court can set it aside by any of these methods. But we do not believe that the power granted to the trial court under section 1203.4 can be given this effect. An order granting a new trial or a reversal of the judgment of conviction is based upon the premise that error was committed which renders it uncertain whether the defendant is actually guilty of the crime of which he was convicted. [Citation.] So long as such action can be taken, it is clear that the judgment of conviction is not final because it is still possible that an ultimate determination on the merits will find the defendant not guilty. [Citation.] No such considerations are present in the granting of probation to a convicted defendant. Whether the court suspends the rendition of the judgment of conviction or whether it merely suspends the execution of the judgment, the order of probation presupposes that the defendant is guilty. ... In either event the order granting probation is

based upon the premise of the defendant's guilt, while a reversal upon appeal or an order granting a new trial is based upon the premise that the defendant's guilt has not been sufficiently proved.

"The powers possessed by the trial courts under the probation statutes (Pen. Code, §§ 1203 et seq.) are concerned with mitigation of punishment and confer discretion upon the courts in dealing with a convicted defendant. The power of the court to reward a convicted defendant who satisfactorily completes his period of probation by setting aside the verdict and dismissing the action operates to mitigate his punishment by restoring certain rights and removing certain disabilities. But it cannot be assumed that the legislature intended that such action by the trial court under section 1203.4 should be considered as obliterating *the fact* that the defendant had been finally adjudged guilty of a crime. This is made clear by the provision that the fact of the defendant's conviction can be used against him in any later prosecution, despite dismissal of the action under section 1203.4. In brief, *action in mitigation of the defendant's punishment should not affect *the fact* that his guilt has been finally determined according to law*. Such a final determination of guilt is the basis for the order of disbarment in this case. That final judgment of conviction *is a fact*; and its effect cannot be nullified for the purpose here involved, either by the order of probation or by the later order dismissing the action after judgment." (Italics added.)

Similarly, in *Meyer* v. *Board of Medical Examiners*, 34 Cal. 2d 62, 65 [206 P.2d 1085], the court stated: "The rationale of the *Phillips* case is significant in that it was decided at a time when the State Bar Act referable to conviction of a crime involving moral turpitude as cause for suspension or disbarment ... was essentially the same as the present provisions of the Medical Practice Act ... and the plea or verdict of guilty was deemed the 'record of conviction' in 'conclusive evidence' of the unprofessional conduct. After the date of the Phillips decision, section 6102 of the Business and Professions Code was amended ... to provide for the disbarment 'irrespective of a subsequent order under the provisions of section 1203.4 of the Penal Code.' *Such amendment served to settle the question of legislative intent in conformity with what this court had held was the proper construction of the probation statute as a nonoperative factor in relation to a*

*disbarment order as the outgrowth of a disciplinary proceeding.''* (Italics added.)

In the *Meyer* decision the Supreme Court further declared as follows at pages 66 and 67:

''Like views have prevailed in other situations limiting the effect of a dismissal after conviction, insofar as the existence of guilt by reason of commission of the criminal act is recognized, desite the benefits accorded by the probation statute. Thus (1) an express proviso in section 1203.4 of the Penal Code makes the conviction count against the defendant under the prior conviction statutes if he is subsequently convicted ... or if it is offered for impeachment purposes in a subsequent prosecution . . . (2) the conviction must be considered for the purpose of suspending or revoking a driver's license . . . and (3) not only the fact of previous conviction was properly raised in a second prosecution for failure to provide for a minor child (Pen. Code, § 270) after dismissal of the first upon satisfactory completion of probation, but all matters inherent in such conviction were admissible in evidence—the adjudication that the defendant was the father of the child as conclusive on the issue of parentage. . . . As the release of the 'penalties and disabilities' clause of the probation statute has been so qualified in its application, it does not appear that it was thereby intended to obliterate the record of conviction against a defendant and purge him of the guilt inherent therein ... or to 'wipe out absolutely' and for all purposes the dismissed proceeding as a relevant consideration and 'to place the defendant in the position which he would have occupied in all respects as a citizen if no accusation or information had ever been presented against him' .... From this standpoint, appellant's theory that the import of the probation statute and the dismissal proceeding is to expunge the record of the crime ... cannot prevail.''

The *Phillips* and *Meyer* cases, *supra,* were decided by four to three majorities, but in each instance the Legislature subsequently demonstrated its concurrence in the majority's interpretation of the scope of relief granted by section 1203.4 by specifically enacting the essentials of the holdings in these cases into law. (See Bus. & Prof. Code, §§ 2383, 2384 and 6102, subd. (b). Also see sections 12910 and 12911 of the Education Code, providing that dismissal of a conviction under section 1203.4 shall have no effect in proceedings by the State Board of Education and local school districts to determine the qualifications of teachers for employment.)

In two instances a somewhat broader interpretation has been given the provisions of section 1203.4. In *Sherry* v. *Ingels*, 34 Cal.App.2d 632 [94 P.2d 77], it was held that the Department of Motor Vehicles could not deny a license to a driver on the ground that he twice had been convicted of drunken driving when one of the convictions had been set aside under section 1203.4. In *People* v. *Taylor*, 178 Cal. App.2d 472 [3 Cal.Rptr. 186], it was held that the defendant could not be convicted of a violation of Penal Code section 12021 (prohibiting a person convicted of a felony from possession of a firearm) when the prior felony conviction had been set aside. In each instance, the Legislature immediately nullified these interpretations by enacting Vehicle Code section 13555 (formerly § 309) and amending section 1203.4 itself to add what is now the section's concluding paragraph.

An extended and excellent discussion of the policy behind section 1203.4 designed to enable the court to give a meaningful interpretation of the "penalites and disabilities" referred to therein is set forth in *Kelly* v. *Municipal Court*, 160 Cal.App.2d 38, 41-46 [324 P.2d 990]. The court therein concluded as follows with reference to the reasoning of the *Meyers* and *Phillips* decisions: "that 'penalties and disabilities' as used in section 1203.4 have reference to *criminal* penalties and disabilities *or something akin thereto* ..." but do *not* apply to proceedings held in connection with "the protection of the public in the exercise of the police power, not for the purpose of 'punishing' the licensee. ..."

On the specific issue presented in the *Kelly* case, the court held that the provisions of section 290 of the Penal Code, relating to registration of sexual offenders, were sufficiently akin to a criminal penalty or disability (since it was designed to provide for continued police surveillance) that its requirements should terminate with the termination of the probation under section 1203.4.

■ In the instant case, however, it is clear that "in the absence of statute there exists no constitutional or common-law right of access to race tracks or other places of public amusement comparable to the right to accommodation at inns." (*Flores* v. *Los Angeles Turf Club, supra*, 55 Cal.2d 736, 742.) ■ Hence, the use of *the fact* of respondent's conviction by the racing board in determining his right to such access was not designed to *punish* the respondent further but rather to keep the regulated activity "clean and

wholesome" in the public interest. (*Cornell* v. *Reilly*, 127 Cal.App.2d 178, 184 [273 P.2d 572].)

Therefore, the dismissal effected under section 1203.4 was not a bar to such determination, for even if it could be argued that as the result of the dismissal respondent was no longer a person who had been "convicted" of violating section 337a and therefore not subject to exclusion under subdivision (e) of section 2001, Administrative Code, nevertheless it would still remain *a fact* that he was a person who had engaged in bookmaking or illegal wagering and as such excludable under subdivision (a) thereof. The exclusion provided for in subsection (a) is not dependent upon the class of persons defined therein having suffered a "conviction" as the result of their activities.

This is particularly true when the rationale underlying section 19572 is considered. This is set forth in *Flores* v. *Los Angeles Turf Club, supra,* at page 744, in the following language: "[A]s pointed out in the briefs of respondents and amici curiae, there exists a great deal of factual data which might easily have led the Legislature to adopt the system of classification present in section 19561.5 [now § 19572]. The statistics revealing the loss of tax resources to the state through illegal wagering activity, the recidivistic records of convicted bookmakers, the frequent use of the pari-mutuel windows by bookmakers to 'lay-off' portions of their bets in order to hedge themselves against the financial disaster of losing on a horse on which they have accepted a large amount in bets and in order to lower the odds on such a horse, and the difficulty of detecting, among the large crowds at the race tracks who are using the betting windows for legal purposes, those who are using them illegally or who are improperly soliciting customers for illegal side bets, may have caused the Legislature to conclude that only by providing for the exclusion of that class of persons which by its proclivities for recidivism in this field of activity had shown itself most likely to indulge in it, could such conduct be effectively eliminated."

In addition to the fact of respondent's conviction for bookmaking, there was additional evidence introduced at the hearing establishing that thereafter he had engaged in "illegal wagering" as that expression is used in section 2001, subdivision (a), Administrative Code. A witness from the Thoroughbred Racing Protective Bureau testified that in 1950 he had questioned respondent in connection with his

arrest in May of that year. He testified that respondent had told him that he had been engaged in "past posting" with one Nick Davis.

"Past Posting" is a method of wagering which depends on one's receiving the results of a race before a bookmaker does and while the bookmaker is still taking bets on the race. It enables the practitioner to place a bet with such bookmaker on the horse already known to have won. Since the bet is not placed at a parimutuel window on the track, it is a criminal violation both of Penal Code section 337a, subdivision 6, and Business and Professions Code, section 19595, and constitutes "illegal wagering."

In this same conversation, respondent admitted that he was "pushing" or "laying off" money at California tracks for one Hy Goldbaum, a "betting commissioner," and for other betting commissioners. A "betting commissioner" is a man who performs a form of underwriting for other bookmakers. If a bookmaker has accepted heavy bets on one horse, he faces the prospect of large losses if the horse wins. In order to protect himself, he will "lay off" with the betting commissioner the whole or some portion of the bets taken by him on the horse. The commissioner may in turn wish to protect himself by having someone place bets upon the horse at the track. The agent who places the bet at the track is known as a "comeback man" and his function is known as "pushing money." This is one of the specific reasons discussed in *Flores, supra,* as underlying the decision of the Legislature to exclude certain persons from the racing enclosures and to prohibit their engaging in partimutuel betting. (See also *People* v. *Oreck,* 74 Cal.App.2d 215, 218-221 [168 P.2d 186]; Third Interim Report of the Special Senate Committee to Investigate Organized Crime in Interstate Commerce, Senate Report No. 307, 82d Cong., 1st Sess., pp. 161-164.)

■ Respondent denied this conversation but determination of the credibility of witnesses was for the board and not the reviewing court; and in an administrative proceeding, an admission against interest is sufficient to prove the existence of the facts admitted. (*Hansen* v. *Civil Service Board,* 147 Cal.App.2d 732, 738 [305 P.2d 1012].) ■ Thus, clearly, the burden was upon respondent to prove his rehabilitation in the administrative proceeding in which he sought a determination that the otherwise applicable exclusionary rules should not be applied to him, and this burden must be met by producing *positive* evidence of rehabilitation. (Cf. *Maggart*

v. *State Bar,* 29 Cal.2d 439, 443-444 [175 P.2d 505]; *Housman* v. *Board of Medical Examiners,* 84 Cal.App.2d 308, 318 [190 P.2d 653, 192 P.2d 45].)

At the hearing held before the board, respondent called no witnesses and offered no evidence in support of his claim of rehabilitation other than his own testimony that he had not engaged in bookmaking since his conviction in 1939. The board, of course, was not required to believe respondent even if his statements were not directly controverted. (*Burako* v. *Munro, supra,* 174 Cal.App.2d 688, 692; *Kendall* v. *Board of Osteopathic Examiners,* 105 Cal.App.2d 239, 246 [233 P.2d 107].) Moreover, respondent's testimony was evasive, inherently improbable, in most respects, and, in certain specific instances, it was demonstrably false.

Respondent testified that he had not been arrested since 1939, with one exception. But, when questioned further, he admitted having been ''apprehended two or three times during a period of years and brought down and questioned about gambling activities.'' While such ''apprehensions'' do not prove that respondent was in fact engaged in gambling activities, his evasiveness in regard thereto is evidence of nonrehabilitation. (Cf. *In re Gehring,* 22 Cal.2d 708, 712 [140 P.2d 413].)

Respondent claimed that he was employed as a salesman on a salary (before taxes and deductions) of $680 per month. Yet, during this same period, telephone records for September, October, November and December, 1960, indicate that he had telephone bills of $234.19, $308.94, $219.73 and $220.06, respectively. These charges were largely the result of long distance calls to persons known to respondent as gamblers or who had well known reputations as bookmakers. His explanation of these calls was singularly unbelievable.[1]

For example, between October 3 and December 15, 1960, respondent made 119 calls to one Joe Brown in Miami, or an

[1]The telephone used to make these countrywide calls and which respondent maintained at his residence address was listed not to respondent, but to one Frank Blount. Respondent testified that Blount was his brother-in-law, once lived in the apartment, and was the original subscriber. However, Blount moved out of the apartment five years before the hearing, and respondent never had the telphone placed in his own name. There was testimony in the record that petitioner used the name Frank Blount as an alias. It was held in *People* v. *Goldstein,* 158 Cal.App.2d 86, 88 [322 P.2d 253], that the maintenance of an apartment and a telephone under an assumed name helps support an inference of illegal purpose.

average of one and a half calls per day, including Sundays. Respondent testified that all these calls were made *only* for the purpose of interesting Mr. Brown in investing money in a real estate venture which respondent was promoting. The telephone records, however, indicate that, of these 119 calls, 101 were one-minute calls, 15 were two-minute calls, 2 were three-minute calls, and one was a four-minute call. On three days respondent made four one-minute calls each day. To require the board to believe that a business transaction involving real estate is handled in such a fashion would be to demand credulity unlimited.

Between September 9 and December 31, 1960, and February 15 and March 31, 1961, respondent made 124 calls to two numbers in Covington, Kentucky. Respondent testified that these calls (99 of which were one-minute calls, 17 were two-minute calls, 7 three-minute calls, and one a four-minute call) were to a Mr. Deckelbaum identified by respondent as a "gambler that lived in Cincinnati, Ohio," and were for the dual purpose of interesting him in respondent's real estate venture and asking him for horse selections. A press clipping from the Los Angeles Times, dated June 28, 1961,[2] reported the indictment of Mr. Deckelbaum and others on a federal charge of illegally using telephones for an organized nationwide horse racing betting system, ranging from Los Angeles and Las Vegas to Chicago, New Orleans, Miami and Atlantic City. Mr. Deckelbaum and his codefendants were identified as "some of the biggest names in horse race layoff gambling operations."

Respondent testified that he made telephone calls all over the United States to obtain information on horse selections which he would use only in his own parimutuel betting. He claimed that this information was given to him for nothing and that he did no favors in return. Such statements certainly do not compel belief as a matter of law.

Respondent further testified that because of the irregular hours demanded by his selling job, he attended the race tracks some three times a week. He admitted that he left the track between races to go to the telephone and that he returned within five minutes. These facts, coupled with

---

[2]Although hearsay, this clipping was admissible under Government Code, section 11513, which provides in part: "Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions."

respondent's admission that he had been ''pushing money'' for betting commissioners, and the testimony of a witness that he had observed respondent placing large bets at the parimutuel window, was abundantly sufficient to warrant the board's conclusion that respondent was in fact acting as a ''comeback man.''

In one instance, respondent testified that he did not know a ''Dr. Hemingway'' and had never had any telephone conversations with him. Yet the records of respondent's telephone calls showed that on September 9, 1960, he accepted a collect call from Dr. Hemingway from San Diego, California. A witness from the Thoroughbred Racing Protective Bureau testified that ''Dr. Hemingway'' is an alias of Mr. Herman Hetzel, a well-known bookmaker and betting commissioner in San Diego. A witness testifying falsely under oath is scarcely in a position to urge that he has established conclusively his rehabilitation by positive evidence.

It is difficult to perceive how the board, upon the evidence before it, could have reached a conclusion that respondent had made a sufficient showing of rehabilitation to avoid the application of the exclusionary rules as to him. But even if a reviewing court reasonably could have reached a different conclusion, as the trial court apparently did in the instant case, the decision of the board could be reversed only if it constituted a clear abuse of discretion. (*Martin* v. *Alcoholic Beverage etc. Appeals Board,* 52 Cal.2d 238, 248 [340 P.2d 1].) When all evidence contrary to that received in support of the board's findings in the present case is disregarded (*Thompson* v. *City of Long Beach, supra,* 41 Cal.2d 235, 241), and all legitimate and reasonable inferences indulged in their support (*Marcucci* v. *Board of Equalization,* 138 Cal.App.2d 605, 608 [292 P.2d 264]), it cannot be said that such a clear abuse of discretion here appears.

The judgment is reversed.

Fox, P. J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 19, 1964. Traynor, J., and Peters, J., were of the opinion that the petition should be granted.