Filed 5/28/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SAVE OUR HERITAGE ORGANISATION, | D063992 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00102270-CU-TT-CTL) |
| CITY OF SAN DIEGO et al., | |
| Defendants and Respondents; | |
| THE PLAZA DE PANAMA COMMITTEE, | |
| Real Party in Interest and Appellant. | |

APPEALS from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge. Affirmed in part and reversed in part.

Brandt-Hawley Law Group and Susan Brandt-Hawley for Plaintiff and Appellant.

Seltzer Caplan McMahon Vitek and G. Scott Williams for Real Party in Interest and Appellant.

Jan I. Goldsmith, City Attorney, Daniel F. Bamberg, Assistant City Attorney, and Jana Mickova Will, Deputy City Attorney, for Defendants and Respondents.

Balboa Park, a large urban park created on pueblo lands almost 150 years ago (Stats. 1870, ch. XLII, § 1, p. 49), includes within its confines and as its central core the buildings and plazas designed and constructed for the 1915 Panama-California Exposition and the adjoining buildings and improvements subsequently constructed for the 1935 California Pacific International Exposition (the Complex). When visitors approach from the west to enter the Complex, they traverse a canyon via the Cabrillo Bridge (the Bridge), a significant part of the original 1915 design and construction. The Bridge and the Complex were declared a National Historic Landmark and a National Historic Landmark District nearly 40 years ago. The proposed alterations to the Bridge, an integral element of a revitalization project (the Project) spearheaded by the Committee but opposed by the Save Our Heritage Organisation (SOHO), has become the focal point of the present appeal.

The Project seeks to eliminate vehicles from the plazas within the Complex, and to return the plazas to purely pedestrian zones, simultaneously preserving (for the convenience of those vehicles coming to Balboa Park from the west) the ability of those vehicles to access the southeastern area of the Park across the Bridge. The solution proffered by the Project to this dilemma is to construct the proposed "Centennial Bridge," which would be joined to the Bridge toward the eastern edge of the Bridge to create a detour around the southwestern corner of the Complex. The Centennial Bridge, together with the reconfigured roadways as proposed by the Project, would provide vehicle ingress and egress to a new pay-parking structure (as well as to the existing parking lots and roadways serving the southeastern portions of the Park), and allowing the plazas

2

within the Complex (currently burdened with roads providing access to the southeastern portions of the Park) to be sealed off from vehicles and become the desired pedestrian-only zones.

The City of San Diego (City), after a thorough review of the project, approved it. SOHO filed a petition for writ of mandate alleging, among other things, that City erroneously approved the required site development permit because there was no substantial evidence to support the finding the Project would not adversely affect the applicable land use plan (as required by San Diego Mun. Code, § 126.0504, subd. (a)),[1] or to support the supplemental finding (as required by § 126.0504, subd. (i)) that there would be no reasonable beneficial use of the property were the Project denied. The trial court agreed there was no substantial evidence to support the supplemental finding there would be no reasonable beneficial use of the property were the Project denied, and therefore granted SOHO's petition. Committee appeals that ruling.[2]

---

[1]　All further statutory references are to the San Diego Municipal Code unless otherwise specified.

[2]　SOHO's petition also alleged City abused its discretion in certifying the Environmental Impact Report (EIR) because the EIR was inadequate (count one), and one component of the Project (a paid parking garage) violated an 1870 statute requiring City hold Balboa Park as a "free and public park." The trial court's judgment rejected both of those claims, and SOHO has cross-appealed from those aspects of the judgment.

3

## I

## FACTUAL AND PROCEDURAL BACKGROUND

A. <u>The Project Area and Goals: Pedestrianizing the Complex</u>

In 1915, the Park hosted the Panama-California Exposition. For that event, City built a series of exhibit halls in the Spanish Colonial Revival style along El Prado and, as access to El Prado from the west, also built the Bridge. Twenty years later, the Park hosted the 1935 California Pacific International Exposition, for which additional buildings, paths and gardens were constructed. In 1977, the Bridge and the Complex were declared a National Historic Landmark and a National Historic Landmark District.

In anticipation of the centennial celebration of the Panama California Exposition, City asked a local philanthropist, Dr. Irwin Jacobs, to undertake the effort to shepherd through the design and review process a project to revitalize the Complex by, among other things, restoring the Complex to a vehicle-free zone as it existed during the 1915 Panama California Exposition and, later, during the 1935 California Pacific International Exposition. Dr. Jacobs founded the Committee, which began an arduous process that ultimately resulted in the proposed Project approved by City.[3] The Project proposed to close El Prado—along with the Plaza de Panama, the Mall and the Pan America Promenade—to vehicular traffic and restrict those spaces to pedestrian uses; and to

---

[3] The process involved several years during which hundreds of meetings were held with various groups to discuss designs, impacts, potential alternatives and improvements. The EIR for the Project contained over 3300 pages, which included detailed consideration of numerous alternatives (including the so-called "no project" alternative) and included a detailed analysis of the Project's impacts.

resurface and landscape those areas with pedestrian-friendly materials in a manner reminiscent of the space as it existed at the time of the 1915 and 1935 Expositions.[4]  The Project proposed increasing the supply of parking close to the Complex (adding 260 spaces) by building an underground pay-parking structure on top of which would be sited a 2.2 acre rooftop park, including re-creating the California Gardens, which had previously been on the site.  To preserve the goal of traffic access to the Complex from the west (across the Bridge), the Project proposed to construct a bypass bridge (the Centennial Bridge) starting at the eastern abutment of the Bridge (just before the archway entrance to the Plaza de California), which would curve south around the Museum of Man and then connect into a reconfigured Alcazar parking lot.  From there, the Project proposed that traffic would continue through, via a new bypass road denominated the

---

[4]     The goal of removing private vehicular traffic and parking from the Complex and returning it to pedestrian uses has been a long-standing goal of Balboa Park planners. Following the removal of vehicles from East El Prado in the 1970s, the 1989 Balboa Park master plan recommended making Pershing Drive the primary vehicular access point to Balboa Park and, as part of the plan, the Laurel Street/Cabrillo Bridge corridor would be de-emphasized as vehicular access point in favor of enhanced pedestrian and transit access including the provision of intra-park tram service and eventually the construction of a light rail line on Park Boulevard.  The plan called for the eventual reclamation of the Prado and Pan American plaza areas as pedestrian plazas and (to accommodate the continued need for parking) the Balboa Park master plan also recommended construction of parking structure on the site of the Organ Pavilion parking lot.  The 1992 Central Mesa precise plan superseded the Balboa Park master plan, although its recommendations are largely the same with regard to vehicular and pedestrian circulation.  The precise plan called for long-term improvements to pedestrian access by removing parking from Plaza de Panama and by replacing the lost parking spaces in a new parking structure to be built on the site of the Organ Pavilion parking lot, and recommended providing tram service when the park is open and restricting private vehicle use in the El Prado area to one lane of eastbound traffic when the tram is in operation, and two-way traffic occurring only after-hours when the tram would not be in operation.

Centennial Road, by exiting the reconfigured Alcazar parking lot and following the northern and eastern rims of Palm Canyon to Pan American Road East, where it would go underground behind the Spreckels Organ Pavilion to provide access to a new underground pay-parking structure to be built on the site of the Organ Pavilion parking lot. Centennial Road would also continue beyond the parking structure to connect to Presidents Way.

B. The Flashpoint: The Centennial Bridge

Public opposition to the Project expressed concerns over the negative impacts of the Centennial Bridge to the Bridge.[5] The EIR concluded the Centennial Bridge would have a significant impact on historical resources and, due to that impact, would have significant visual and land use consequences. Despite the impact the Centennial Bridge would have on the Bridge,[6] the EIR's historical resources technical report concluded the Project *as a whole* would have "mainly beneficial" impacts on historical resources. City's historical resources expert agreed that, although there were impacts to the Bridge, the historical benefits resulting from the Project (by restoring several historic elements within

_____

[5] Public opposition to the Project also expressed concerns over the loss of free parking caused by the proposed removal of an existing parking lot and its replacement with the underground pay-parking structure.

[6] The EIR's historical resources technical report stated the Project would result in "several adverse physical and visual impacts to Cabrillo Bridge and the California Quadrangle as well as limited number of impacts to the historic district as whole," and concluded that although the Project "appears to comply with Secretary of the Interior's Standards for Rehabilitation . . . 1, 3-8, and 10 . . . [i]t does not appear to comply with Standards 2 and 9."

the Complex and removing nonhistoric elements) outweighed any negative impacts on the historical district from the Project.[7]

After the proposed final EIR was prepared, the Project was formally reviewed by numerous City boards, including the Balboa Park Committee, the Parks and Recreation design review committee, the historical resources board, and the planning commission. The matter was then submitted to the City council, which—after holding a marathon hearing at which countless speakers expressed their views—voted to approve the Project. City certified the EIR, and approved the site development permit for the Project.

C. The Lawsuit and Ruling

SOHO filed the instant action alleging three broad claims. It asserted City violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) in count one (the CEQA challenge), by approving an EIR that was deficient or inadequate in numerous ways, including its statement of the Project's objectives, its assessment of Project alternatives and impacts, and in its responses to public comments. In count three (the free and public park challenge), it asserted the Project as approved violated the California Statutes of 1870, which requires Balboa Park be held "for the use and purposes of a free and public park," because the Project's component of a paid parking garage violated that stricture. Finally, in count two (the

---

[7]     The same expert concluded the Project as proposed would not result in the property ceasing to meet the criteria for listing in the National Register or designation as National Historic Landmark because "[t]he qualities which caused it to be originally listed would not have been lost or destroyed as result of the project," and the process to remove or withdraw the listing from the National Register was neither underway nor anticipated.

Municipal Code challenge), SOHO asserted City's Municipal Code mandated that two key findings be made before the Project could be approved and, although City made the requisite findings, those findings did not have substantial evidentiary support.

The court rejected SOHO's CEQA challenge and also rejected SOHO's "free and public park" challenge. However, the court agreed with SOHO's Municipal Code challenge, concluding City's approval of the Project violated section 126.0504, subdivision (i)(3), which requires (for projects with impacts on historical resources) that City find there be "no reasonable beneficial use" of the property without the Project. The trial court found there was no substantial evidence the Complex would have "no reasonable beneficial use" without the Project.[8] The court granted SOHO's petition and directed City to rescind the site development permit issued for the Project.

II

APPLICABLE LEGAL PRINCIPLES

A. Standards of Review

The parties agree that, when evaluating an action to set aside an agency's decision approving a project, a court is limited to determining whether or not the agency prejudicially abused its discretion. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 673 (*San Franciscans*).)

---

[8]     Because the court ruled in SOHO's favor under San Diego Municipal Code section 126.0504, subdivision (i)(3), the court found it was unnecessary to rule on SOHO's claim that there was no substantial evidence to support the finding under Municipal Code section 126.0504, subdivision (a)) that the Project would not adversely affect the applicable land use plan.

8

Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence. (*In re Bay–Delta etc.* (2008) 43 Cal.4th 1143, 1161.) Because SOHO's contention rests on the allegation the critical findings were not supported by substantial evidence, we note our review of that issue requires we "must resolve reasonable doubts in favor of the administrative finding and decision." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.) As relevant here, the term " 'substantial evidence' means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Quoting CEQA regulations; citation.] [S]ubstantial evidence may include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts, but not argument, speculation, unsubstantiated opinion, or clearly erroneous evidence." (*San Franciscans, supra,* 102 Cal.App.4th at p. 675.) A reviewing court may not substitute its views for those of the agency whose determination is being reviewed or reweigh conflicting evidence presented to that body (*id* at p. 674), because it is not the court's task " 'to determine who has the better argument.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard Area Citizens*).) Instead, "[t]he decisions of the agency are given substantial deference and are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497 (*Sierra Club*).)

When reviewing agency determinations, including whether the agency's findings are supported by substantial evidence, "the trial court and the appellate courts essentially perform identical roles. We review the record de novo and are not bound by the trial court's conclusions." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479.)

B. Principles of Statutory Construction

The pivotal issue here is the proper interpretation of what is required by section 126.0504, subdivision (i)(3), before City may approve a project that involves a substantial alteration of a designated historical resource or within a historical district. The parties have cited no case law construing section 126.0504, subdivision (i)(3), or any case law construing ordinances containing analogous language. The proper interpretation of section 126.0504, subdivision (i)(3)'s requirements appears to be a question of first impression.

As in any case involving statutory interpretation, "[o]ur first step is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning." (*People v. Valladoli* (1996) 13 Cal.4th 590, 597.) We should strive to give effect and significance to every word and phrase of a statute (*Steinberg v. Amplica, Inc.* (1986) 42 Cal.3d 1198, 1205) because we presume the enacting body intended "every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function." (*Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233.) Courts interpret ordinances in the same way they construe statutes (*Anderson v. San Francisco Rent Stabilization & Arbitration Bd.* (1987) 192 Cal.App.3d 1336, 1343), and because questions of law—including

10

interpretation of a statute—are subject to de novo review, we accord no deference to the trial court's ruling on this issue. (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1081-1082.)

III

ANALYSIS OF COMMITTEE'S APPEAL

A. <u>The Relevant Municipal Code Provisions and City Findings</u>

*The Applicable Ordinance*

City's Municipal Code provides that "[t]he purpose of the Site Development Permit procedures is to establish a review process for proposed *development* that, because of its site, location, size, or some other characteristic, may have significant impacts on resources or on the surrounding area, even if developed in conformance with all regulations. The intent of these procedures is to apply site-specific conditions as necessary to assure that the *development* does not adversely affect the applicable *land use plan* and to help ensure that all regulations are met." (§ 126.0501.) Section 126.0504 provides a site development permit may be approved or conditionally approved "only if the decision maker makes all of the *findings* in Section 126.0504(a) and the supplemental *findings* in Section 126.0504(b) through (o) that are applicable to the proposed *development* as specified in this section."

The findings required under subdivision (a) for all site development permits require the determination that the proposed development "will not adversely affect the applicable land use plan." In addition, subdivision (i) of section 126.0504 provides:

11

"(i) Supplemental Findings--Historical Resources Deviation for Substantial Alteration of a Designated Historical Resource or Within a Historical District

"A Site Development *Permit* required in accordance with Section 143.0210 because of potential impacts to *designated historical resources* where a deviation is requested in accordance with Section 143.0260 for substantial alteration of a *designated historical resource* or within a *historical district* or new construction of a *structure* located within a *historical district* may be approved or conditionally approved only if the decision maker makes the following supplemental *findings* in addition to the *findings* in Section 126.0504(a):

"(1) There are no feasible measures, including a less environmentally damaging alternative, that can further minimize the potential adverse effects on the *designated historical resource* or *historical district*;

"(2) The deviation is the minimum necessary to afford relief and accommodate the *development* and all feasible measures to mitigate for the loss of any portion of the *historical resource* have been provided by the *applicant*; and

"(3) The denial of the proposed *development* would result in economic hardship to the owner. For purposes of this finding, 'economic hardship' means there is no reasonable beneficial use of a property and it is not feasible to derive a reasonable economic return from the property."

*City's Findings Pursuant to the Ordinance's Requirements*

City, after noting the Project was intended to restore pedestrian and park uses to the core of the central mesa area (Central Mesa) of Balboa Park and to alleviate pedestrian/vehicular conflicts, made several findings to satisfy the requirements of

12

section 126.0504, subdivision (i)(3)'s requirement for "no reasonable beneficial use" of the property absent the Project.[9]  City found:

> (1) Denial of the Project would not allow City to take advantage of donations offered to design and construct the project, as well as to fund a substantial portion of the development;

> (2) Denial of the Project would "prevent the City from fulfilling a stated plan goal of providing 'new and redeveloped facilities on the Central Mesa that will be designed to accommodate multiple uses, including special events and maximum public access,' due to the continued loss of the Plaza de Panama area to pedestrian use and the lost opportunity for additional park land in the location of the Organ Pavilion parking lot."  City noted there is a movement throughout the nation toward improving the pedestrian experience within prominent public spaces, and that such improvements can "increase the economic success of the region . . . [and] revitalize neighborhoods."

> (3) Denial of the Project would "also prevent the City from being able to return El Prado, Plaza de Panama, Plaza de California, and the Mall to pedestrian use without conflicts with vehicles, while still providing vehicular access and parking to the Central Mesa, thereby preventing beneficial use of the property.  By restoring these areas to pedestrian uses and recreating a grand ceremonial plaza for recreation and civic activities, the project creates additional park acreage, and ensures the continuing vitality of Balboa Park . . . .  As discussed within the Environmental Impact Report prepared for the project (Item 4.4.1.7), the Plaza de Panama experiences significant

---

9    City, apparently recognizing that same subdivision indicated economic hardship was also defined to mean the infeasibility of deriving a reasonable economic return from the property absent the project, specifically noted that, although "reasonable economic returns are typical considerations for private properties and variety of publicly-owned properties, the desire and assumption of a reasonable economic return is generally not contemplated when considering uses of public park land, which typically contain few profit-making ventures.  Therefore a reasonable economic return in these circumstances, a public improvement in Balboa Park, is a very minimal consideration.  The adopted plan goals for Balboa Park do not specify the desirability of deriving reasonable economic return for uses within the park.  Rather, the goals are essentially to preserve, enhance, restore, improve and create park features for the citizens of San Diego."

13

pedestrian/vehicle conflicts.  In addition, members of the public have commented on seeing frequent pedestrian and car near-miss accidents almost daily in the park.  Without the development, the current pedestrian/vehicle conflicts would continue, resulting in an undesirable park experience."

(4) Denial of the Project would make it unlikely there would be "public funds available for improvements to resolve Balboa Park's long-standing traffic circulation and pedestrian conflicts."  City noted various studies, including studies in 2004 and 2006, have "identif[ied] the existing traffic circulation and parking issues within the core of the park and have had no available funding to implement proposed solutions," and the Central Mesa precise plan "has been in place for 20 years and no funding has been available to pay for the implementation of this component of the Plan," and the Project would solve these issues by serving as a "catalyst for private investment in the park, enabling the newly created Balboa Park Conservancy to continue such efforts."

Thus, City's findings identified the factual basis of, and its core rationale for, its conclusion that denial of the Project would "result in . . . there [being] no reasonable beneficial use of" the Complex: denial of the Project would mean traffic congestion and conflicts between pedestrians and vehicles would continue to burden the users of the Complex, and denial of the Project would prevent City from recapturing those areas currently being claimed and used by vehicles as thoroughfares and parking lots and reclaiming those lands for parklands and pedestrian spaces.

B. Analysis of SOHO's Challenge under Section 126.0504, Subdivision (i)(3)

*Proper Interpretation of "No Reasonable Beneficial Use" of the Property*

The resolution of the competing claims turns on the meaning of the phrase "no reasonable beneficial use of a property" as employed by section 126.0504, subdivision (i)(3).  SOHO contends, and the trial court found below, that as long as a project

14

opponent introduces evidence the property is being put to *some* "beneficial use" by the owner without the proposed project, there can be no substantial evidentiary support for the supplemental findings by the decision-maker required under section 126.0504, subdivision (i)(3). Committee notes, however, that section 126.0504, subdivision (i)(3), does not simply state a project must be rejected if the property is being put to *any* "beneficial use" by the owner without the proposed project, but instead states a project can be approved if denial of the proposed project "means there is no *reasonable* beneficial use of [the] property." (§ 126.0504, subd. (i)(3), italics added.) Committee contends that, by employing the term "reasonable" to qualify the term "beneficial use," the decision-maker is vested with the discretion to make a qualitative determination of whether an existing use of the property, even if deemed beneficial, is also a *reasonable* use of that property under all of the facts and circumstances applicable to the particular property in question.

We agree with Committee that, to give effect and significance to every word and phrase in the ordinance and insure each word performs a useful function (*Steinberg v. Amplica, Inc., supra,* 42 Cal.3d at p. 1205; *Clements v. T. R. Bechtel Co., supra,* 43 Cal.2d at p. 233), we must construe the term "reasonable" to have a meaning independent of the phrase "beneficial use." (*San Diego Police Officers Assn. v. City of San Diego Civil Service Com.* (2002) 104 Cal.App.4th 275, 284 ["In construing a statute we are required to give independent meaning and significance to each word, phrase, and sentence in a statute and to avoid an interpretation that makes any part of a statute meaningless."].) Under that construction, it is not enough for an opponent to preclude a

15

finding under section 126.0504, subdivision (i)(3), by introducing evidence the property has *a* beneficial use without the Project.  Instead, an opponent must demonstrate, to the satisfaction of the decision-maker, that the property's current beneficial use without the Project is a *reasonable* beneficial use.

Our construction of section 126.0504, subdivision (i)(3), also accords with the admonition that courts should endeavor to give statutes a commonsense interpretation. (*People v. Valladoli, supra,* 13 Cal.4th at p. 597.)  Under our construction, section 126.0504, subdivision (i)(3), permits the decision-maker to decide whether an existing use of a property is unreasonable, even though that existing use may be beneficial in some manner to someone.  The contrary interpretation—that a project must be rejected if there is anyone who could posit a conceivable beneficial use of the property without the project—would set a nearly insurmountable bar to a project that proposes to alter the historical resource, because it is difficult to perceive (except in the most extreme circumstances) how a property could be deemed to have no beneficial use whatsoever. Indeed, our interpretation—that the decision-maker must decide whether the property's unmodified condition nevertheless permits uses that are reasonable for that particular property—has the salutary value of preserving to administrative agencies the discretion in land use determinations that courts have historically accorded to those determinations. (See, e.g., *Building Industry Assn. of Central California v. County of Stanislaus* (2010) 190 Cal.App.4th 582, 592 [land use determinations are entitled to deference by courts]; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 386 [same].)  Under our interpretation, the question for the courts is not

16

whether there was evidence from which a reasonable person could have concluded the property had some beneficial use in its unmodified condition, but instead whether substantial evidence supports the decision-maker's determination that the property's uses in its unmodified condition were not reasonable under all of the circumstances. (Cf. *Auburn Woods I Homeowners Assn. v. Fair Employment & Housing Com.* (2004) 121 Cal.App.4th 1578, 1593-1595 [rejecting challenge to FEHA decision finding that condominium association's blanket ban on dogs violated obligation to permit "reasonable" accommodation necessary for owner's use and enjoyment of her home; court reasoned that an administrative agency's determination, based on a necessarily fact-specific inquiry, is entitled to deference and does not require proof that individual was incapable of any use or enjoyment of her home].)

We construe section 126.0504, subdivision (i)(3), as vesting in the decision-maker the discretion to determine two issues: whether the owner's ability to use the property without the project can be deemed a "beneficial" use, and whether the beneficial uses to which the property *can* be put without the project can be deemed "reasonable" uses. This is a determination vested in the decision-maker, and it is not our role " 'to determine who has the better argument.' " (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 435.) Instead, we must give the decision substantial deference, presume it to be correct, and resolve reasonable doubts in favor of the administrative findings. (*Sierra Club, supra,* 121 Cal.App.4th at p. 1497.)

17

*Substantial Evidence Supports the Finding of "No Reasonable Beneficial Use" of the Complex Without the Project*

Under our construction, there is substantial evidence to support City's findings that, without the Project, the current use of the Complex is not a *reasonable* use. City noted there were "long-standing traffic circulation and pedestrian conflicts" within the complex and found, without the Project, City would be unable to return the complex "to pedestrian use without conflicts with vehicles, while still providing vehicular access and parking to the Central Mesa, thereby preventing beneficial use of the property." City specifically found that the Complex, in its unmodified condition, "experiences significant pedestrian/vehicle conflicts. In addition, members of the public have commented on seeing frequent pedestrian and car near-miss accidents almost daily in the park. Without the development, the current pedestrian/vehicle conflicts would continue, resulting in an undesirable park experience." Thus, City clearly concluded that traffic congestion—and the concomitant endangerment of pedestrians who wished to use the Complex—rendered the existing use of the Complex an unreasonable one, and that without the Project's proposed reconfiguration of the traffic flow, the *reasonable* beneficial use of a property would be prevented. Certainly, ample evidence supported the underlying factual basis for City's conclusions. City had evidence that existing traffic problems, as well as projected deterioration of those traffic conditions,[10] would plague the Complex without the

---

[10]    SOHO argued below, and the trial court agreed, that section 126.0504, subdivision (i)(3), requires a finding there "is" no reasonable beneficial use of the property as of the date the Project is approved, and cannot be premised on evidence there "will be" no

18

Project: the EIR's traffic analysis showed current traffic levels failed (defined to mean level of service E or F) in the Plaza de Panama on weekends and a traffic study showed that, without the Project, Saturday morning queues leading to Plaza de Panama would extend 374 feet eastbound along West El Prado and 231 feet northbound along the Esplanade. Indeed, City had evidence that, without the Project, failing traffic levels would spread to include traffic on Presidents Way by 2015 and that, by 2030, virtually all of the intersections in the Complex would fail on weekends. However, because the evidence permitted City to conclude these problems would be ameliorated by the Project, there was evidence supporting the conclusion the Complex would have no *reasonable* beneficial use without the Project.

Moreover, there was evidence that, without the Project, there was no *reasonable* beneficial use of the Complex because the users of the Complex itself are the pedestrians who frequent its numerous attractions or wish to enjoy its open spaces, but the existing configuration created substantial conflicts between pedestrians and vehicles, creating safety hazards to the very persons seeking to beneficially use and enjoy the Complex. Because the evidence permitted City to conclude these problems would be ameliorated by the Project, and indeed would be entirely eliminated within the newly created pedestrian-

reasonable beneficial use of the property without the Project, and therefore evidence of projected problems cannot support a finding under section 126.0504, subdivision (i)(3). We decline to give section 126.0504, subdivision (i)(3), such a narrow interpretation, because that construction would limit City planners to approving projects under section 126.0504, subdivision (i)(3), only in reaction to existing problems (and then only in such increments as are necessary to solve existing problems) rather than permitting them to approve projects under section 126.0504, subdivision (i)(3), proactively and in a scope to accommodate future conditions.

only areas, there was additional evidence to support the conclusion that, without the Project, the Complex would have no *reasonable* beneficial use for those persons seeking to use and enjoy the Complex.

SOHO argues we must affirm the trial court's ruling because City's finding that the Complex had "no" reasonable beneficial use without the Project cannot be squared with the undisputed evidence that, even without the Project, the complex is "swarmed with admiring, enthralled visitors on a daily basis." However, whether the Complex cannot *reasonably* be beneficially used without the Project—that is, whether it is a "reasonably beneficial use" of the Complex to force the patrons who use the Complex to encounter the dangers and endure the degraded experience within the Complex caused by the continued use of the land as a roadway for ever-increasing numbers of vehicles—is not a matter of law but instead requires a weighing of the competing interests laying claim on the Complex. As such, a reviewing court may not substitute its views for those of the agency whose determination is being reviewed, or reweigh conflicting evidence presented to that body (*San Franciscans, supra,* 102 Cal.App.4th at p. 674), because it is not the court's task " 'to determine who has the better argument.' " (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 435.) The fact millions of visitors to the Complex choose to visit, notwithstanding the hardships to them posed by continued vehicular use of the Complex, does not automatically require City to find continued vehicular use of the Complex *is* a "reasonably beneficial use" of the Complex or, stated differently, preclude City from finding the Project is appropriate because continued automobile use of the Complex is *not* a "reasonably beneficial use" of the Complex.

20

*The "Reasonable Economic Return" Claim*

SOHO alternatively asserts there was no substantial evidence to support the additional finding under section 126.0504, subdivision (i)(3), ordinarily required when a proposed project would make a substantial alteration of a designated historical resource or within a historical district, that denial of Project would make it "not feasible to derive a reasonable economic return from the property."

We reject SOHO's argument because it was not preserved below. SOHO cites nothing in the administrative record to suggest that, during the administrative proceedings, anyone challenged approval of the Project based on the assertion it would be feasible to derive a reasonable economic return from the property even without the Project within the contemplation of section 126.0504, subdivision (i)(3). Under such circumstances, the issue may not be raised for the first time in a judicial challenge to the administrative decision. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417-419 [doctrine of exhaustion of administrative remedies generally precludes judicial review of issues, legal and factual, not first presented at the administrative agency level]; *Running Fence Corp. v. Superior Court* (1975) 51 Cal.App.3d 400, 429 [alleged violations of CEQA not raised at the administrative level "cannot be raised for the first time on seeking court review"].) Although SOHO and others did challenge that the evidence could support the finding under section 126.0504, subdivision (i)(3), as to "no reasonable beneficial use," we are cited nothing to suggest the feasibility of deriving a reasonable economic return was interposed at the administrative proceedings, and generalized objections will not suffice to preserve the

21

issue. For example, in *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, petitioner opposed the county's approval of a land use permit for construction of an apartment complex and argued the issue of density restrictions, but only in the most general terms. The subsequent petition for writ of mandate, however, alleged the project would violate specific density limitations in the county's general plan. Rejecting that challenge, the Court of Appeal explained at pages 1019 to 1020: " 'It was never contemplated that a party to an administrative hearing should withhold any defense . . . or make only a perfunctory or "skeleton" showing in the hearing and thereafter obtain an unlimited trial de novo, on expanded issues, in the reviewing court. [Citation.] . . . "Having failed to raise the [issue] before the commission, the appellant waived his right to that . . . defense." ' [Quoting *Bohn v. Watson* (1954) 130 Cal.App.2d 24, 37.]"

Even assuming the issue was preserved, we would reject SOHO's claim on its merits. First, the administrative decision is presumed correct, and it is the challenger's burden to demonstrate otherwise (*Sierra Club, supra,* 121 Cal.App.4th at p. 1497), and SOHO cites nothing to suggest that aspect of section 126.0504, subdivision (i)(3) has any relevance to the Project approved by City. Specifically, SOHO cites nothing suggesting the feasibility of deriving a reasonable economic return from the property without the Project has any application when the principal goals of and purposes for the Project under consideration are unrelated to deriving increased profits from the property, and City found it did not apply to this project, stating:

> "While reasonable economic returns are typical considerations for private properties and a variety of publicly-owned properties, the desire and assumption of a reasonable economic return is generally

22

not contemplated when considering uses of public park land, which typically contain few profit-making ventures. Therefore, a reasonable economic return in these circumstances, a public improvement in Balboa Park, is a very minimal consideration. The adopted plan goals for Balboa Park do not specify the desirability of deriving a reasonable economic return for uses within the park. Rather, the goals are essentially to preserve, enhance, restore, improve and create park features for the citizens of San Diego."

SOHO makes no claim that City's principal findings—i.e., that reasonable economic return is generally *not* contemplated when considering uses of public park land, and the adopted plan goals for Balboa Park do not specify the desirability of deriving reasonable economic return for uses within the park—lack evidentiary support. We are not persuaded by SOHO's claim that City's finding as to this aspect of section 126.0504, subdivision (i)(3), was inadequate or lacking in evidentiary support.

B. Analysis of SOHO's Challenge under Section 126.0504, Subdivision (a)

SOHO also alleges there was no substantial evidence to support City's findings, required by section 126.0504, subdivision (a), that approval of the Project would not adversely affect City's applicable land use plans.[11] SOHO specifically notes the EIR acknowledged the alterations associated with the construction of the Centennial Bridge would not comply with certain policies of the City's general plan (e.g. the historic preservation element, the urban design element, and the recreation element) because the

_____

[11]  SOHO raised this claim in the proceedings below but the trial court found it was unnecessary to reach this claim because of its conclusion there was no substantial evidence to support City's findings under section 126.0504, subdivision (i)(3). Because we reverse that aspect of the trial court's ruling, it is necessary to reach SOHO's claim that no substantial evidence supported City's finding that approval of the Project did not adversely affect City's applicable land use plans.

23

Project involved a significant and unmitigatable impact on a historical resource: the Cabrillo Bridge.[12]  SOHO argues that because the significant impact to the Cabrillo Bridge offended the Secretary of the Interior's Standards 2 and 9 for the rehabilitation of historic buildings,[13] the Project necessarily violated the policies expressed in the historic preservation element, the urban design element, and the recreation element of City's policies, and therefore there was no substantial evidence to support City's global finding that the Project would not adversely affect City's applicable land use plans.

City, in support of its finding the Project would not adversely affect the applicable land use plan, noted:

> "[The Project] is intended to restore pedestrian and park uses to the
> core of the Central Mesa area of Balboa Park and alleviate

---

[12]  For the same reason, the EIR concluded the Project would not be consistent with the policies expressed in the Balboa Park master plan and the Central Mesa precise plan. Specifically, the EIR noted that "primarily because the construction of the Centennial Bridge would not be consistent with the historical visual and spatial relationships of the Cabrillo Bridge and the California Quadrangle complex," that aspect of the Project would be inconsistent with the expressed goals of avoiding disruption of significant views, of preserving and respecting the historical architectural character of the historic structures and site features in Balboa Park that contributed to the designation of the park as a historic landmark, and of adhering to standards promulgated by the Secretary of the Interior for rehabilitation.

[13]  As noted in the EIR, "[t]he U.S Department of Interior National Park Service Cultural Resources, Preservation Assistance Division, *SOI Standards for Rehabilitation and Illustrated Guidelines for Rehabilitating Historic Buildings* . . . provide guidance for reviewing proposed work to historic properties."  Standard 2 states the "historic character of a property will be retained and preserved. The removal of distinctive materials or alteration of features, spaces, and spatial relationships that characterize the property will be avoided."  Standard 9 states that "[n]ew additions, exterior alterations, or related new construction will not destroy historic materials, features, and spatial relationships that characterize the property."  The EIR concluded the alterations to the Cabrillo Bridge would offend these strictures.

24

pedestrian/vehicular conflicts. . . . The applicable land use documents are the Balboa Park Master Plan, . . .the Central Mesa Precise Plan, . . . and the City of San Diego General Plan . . . .

"*Collectively, the General Plan, Balboa Park Master Plan and Central Mesa Precise Plan establish goals and policies of creating a more pedestrian oriented environment within the park, reducing automobile and pedestrian conflicts, improving public access, increasing free and open parkland, restoring landscape areas and restoring the Prado and Palisades to a center for cultural activities and special events. The proposed development would implement these goals* and policies by removing parking and through traffic within the Prado and restoring the area to pedestrian use, which would open up opportunities for cultural activities, special events and general public enjoyment of the park without interfacing with vehicles. [¶] . . . [¶]

"*Although the proposed Centennial Bridge component would be inconsistent with several policies* found in the Urban Design, Recreation, and Historic Preservation Elements of the General Plan, *it would not adversely affect the General Plan and the project as whole would be consistent with several of the goals and policies of San Diego General Plan, as described below.*

"The development's proposal to remove cars from [the Complex] to create a more pedestrian oriented environment would implement goals in the Mobility Element of the General Plan for creating a safe and comfortable environment, and a complete, functional, and an interconnected pedestrian network that is accessible to pedestrians of all abilities. The development would also implement the recommendation in the Urban Design Element for designing and retrofitting streets to improve walkability, bicycling, and transit integration; to strengthen connectivity; and to enhance community identity. [¶] . . . [¶]

"The development's proposal for the rehabilitation of the Plaza de California and Plaza de Panama and the removal of cars from the Plaza de California, El Prado, the Plaza de Panama, the Mall and Pan American Road East would restore the historic design of these areas and meet the Historic Preservation Element goal of preserving the City's important historical resources by returning these areas to pedestrian only use consistent with the 1915 and 1935 Expositions. Further, reactivating these areas for pedestrian use is consistent with

specific recommendations of the Central Mesa Precise Plan . . . and will reclaim approximately 6.3 acres of free and open parkland that will enhance the cultural and recreational uses within the core of the park while preserving the historic character of the Central Mesa.

"The proposed development would meet the goal in the Recreation Element for having park and recreation facilities that are sited to optimize access by foot, bicycle, public transit, automobile, and alternative modes of travel by proposing to restore pedestrian uses in locations presently dominated by vehicular traffic with the Central Mesa of Balboa Park and the implementation of an expanded tram system through the Central Mesa that would connect parking facilities and institutions, and enhancing overall access and circulation.

"Despite the conflicts related to the proposal of the Centennial Bridge component, *the proposed development would be consistent with a majority of the goals and policies of the General Plan, the Balboa Park Master Plan and the Central Mesa Precise Plan and overall would restore pedestrian and park uses to the core of the Central Mesa area of Balboa Park and alleviate pedestrian/vehicular conflicts.  Therefore, the proposed development would not adversely affect the applicable land use plans*."  (Italics added.)

SOHO does not contest that substantial evidence supported the findings that, *collectively*, the general plan, Balboa Park master plan, and Central Mesa precise plan establish goals and policies of creating a more pedestrian-oriented environment within the park, reducing vehicular and pedestrian conflicts, improving public access, increasing free and open parkland, restoring landscape areas, and restoring the Prado and Palisades to being a center for cultural activities and special events.  SOHO does not assert there was no substantial evidence from which City could have concluded the Project would implement these overarching goals and policies by removing parking and through traffic within the Prado and restoring the area to pedestrian use.  Instead, SOHO appears to

26

assert that, as long as a project opponent can identify *any* stated goal or policy within an applicable land use plan that would be adversely affected by a project, the decision-maker is precluded from finding approval of a project would not adversely affect the applicable land use plans even if the decision maker finds, based on substantial evidence, the proposed project would be consistent with vast majority of the goals and policies of the applicable land use plans.

SOHO cites no authority for this argument, and the case law is to the contrary. First, the courts have repeatedly recognized that, when reviewing a challenge to a project based on the project's alleged inconsistency with the relevant land use documents, a court must

> "accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies." ' " (*San Franciscans, supra,* 102 Cal.App.4th at pp. 677-678, quoting *Save our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.)

Importantly, the courts have also recognized that "state law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be '*compatible* with the

27

objectives, policies, general land uses, and programs specified in' the applicable plan. (Gov. Code, § 66473.5, italics added.) The courts have interpreted this provision as requiring that a project be ' " in agreement or harmony with" ' the terms of the applicable plan, not in rigid conformity with every detail thereof. [Quoting *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 718 (*Sequoyah Hills*).]" (*San Franciscans, supra,* 102 Cal.App.4th at p. 678.) As the *Sequoyah Hills* court recognized, "it is beyond cavil that no project could completely satisfy every policy stated in the [general plan], and that state law does not impose such a requirement. [Citations.] A general plan must try to accommodate a wide range of competing interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Sequoyah Hills* at pp. 719-720; accord, *Sierra Club, supra,* 121 Cal.App.4th at pp. 1510-1511 ["[I]t is nearly, if not absolutely, impossible for a project to be in perfect conformity

28

with each and every policy set forth in the applicable plan. An agency, therefore, has the discretion to approve a plan even though the plan is not consistent with all of a specific plan's policies. It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan."].)

Here, SOHO does not contend City failed to consider "the applicable policies and the extent to which the proposed project conforms with those policies . . . ." (*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 720.) We examine only "whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Ibid.*) Here, City found the applicable land use plans (e.g. the general plan, Balboa Park master plan, and Central Mesa precise plan) collectively established "goals and policies of creating a more pedestrian oriented environment within the park, reducing automobile and pedestrian conflicts, improving public access, increasing free and open parkland, restoring landscape areas and restoring the Prado and Palisades to a center for cultural activities and special events," and SOHO does not claim there was no evidence to support this finding. City also found the Project "would implement these goals and policies by removing parking and through traffic within the Prado and restoring the area to pedestrian use, which would open up opportunities for cultural activities, special events and general public enjoyment of the park without interfacing with vehicles," and SOHO likewise does not assert there was no evidence to support this finding.

Finally, City found that, although the proposed alterations to the Cabrillo Bridge transgressed certain aspects of some articulated goals and policies of the applicable land

29

use plans, "the proposed development would be *consistent with a majority of the goals and policies* of the General Plan, the Balboa Park Master Plan and the Central Mesa Precise Plan and overall would restore pedestrian and park uses to the core of the Central Mesa area of Balboa Park and alleviate pedestrian/vehicular conflicts." There is substantial evidence to support that finding. Nearly 50 pages of the EIR was devoted to describing the numerous ways in which the Project was consistent with (and how the Project promoted) the various goals, policies and objectives of the land use policies.[14] The mere fact the Project had some elements that conflicted with a few of the policies embodied in the applicable land use plans does not preclude City from finding the Project as a whole was consistent with the objectives, policies, general land uses, and programs specified in the applicable plans. For example, in *Sequoyah Hills, supra,* 23 Cal.App.4th 704, the project opponent asserted it was an abuse of discretion to approve a project that conflicted with three policy statements in the land use plans, but ignored that the project was fully consistent with at least 14 of the 17 relevant policies, and was consistent in part even with the three policies on which the project opponent relied. The court, rejecting the project opponent's claim, explained that a "project need not be in perfect conformity

---

14     Even as to the historical preservations policies embodied in the applicable land documents, City recognized modifications to the Cabrillo Bridge were inconsistent with some aspects of those policies but found that "[d]espite the conflicts related to the proposal of the Centennial Bridge component, . . . the proposed development would not adversely affect the applicable land use plans" because it concluded the proposed development would be "consistent with majority of the goals and policies" of the applicable land use plans. As to the historic preservation elements, there was evidence that the Project would *further* some historic preservation policies because, by "remov[ing] cars from El Prado, the Plaza de Panama, Plaza de California, the Mall and Pan American Road, the project would restore the historical condition of these areas."

with each and every . . . policy. . . . Indeed, it is beyond cavil that no project could completely satisfy every policy . . . and state law does not impose such a requirement. [Citations.] . . . Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether" substantial evidence supports the conclusion that the project is consistent with those policies. (*Id*. at pp. 719-720.)

There is substantial evidence to support City's conclusion that, despite some inconsistencies engendered by the Bridge, the Project as a whole will not adversely affect the applicable land use plans. We therefore reject SOHO's argument that inconsistencies with some aspects of the polices embodied in the applicable land use plans necessarily precluded City from approving the Project.

III

ANALYSIS OF SOHO'S CROSS-APPEAL

SOHO's petition for writ of mandate alleged City, by approving a project that contemplated building a new pay-parking lot, violated the California Statutes of 1870 (the 1870 Statute) under which City held the lands that became Balboa Park. The 1870 Statute, by which the California Legislature "approved, confirmed and ratified" an 1868 resolution setting aside certain pueblo lands as a park, stated "said lands, and none others, are by this statute declared to be held in trust forever, by the municipal authorities of said city, for the use and purposes of a free and public park . . . and for no other or different

31

purpose . . . ." (Stats. 1870, ch. XLII, §1, p. 49.) SOHO claimed approval of a Project that included building a pay-parking structure violated the "free and public park" limitation under which the land was held by City.

The trial court concluded any limitations imposed by the 1870 Statute had been effectively annulled by subsequent events and enactments, and therefore ruled the Project did not violate the 1870 Statute under which City held the lands that became Balboa Park.[15] SOHO argues this ruling was error because (1) the 1870 Statute was not annulled, and (2) "free" must mean without cost and therefore all necessary adjuncts to public access to the "free and public park," including automobile parking, must always be provided without cost.

A. Historical Background

In *Olmstead v. City of San Diego* (1932) 124 Cal.App. 14 (*Olmstead*), the court (addressing a dispute over City's ability to construct a road through Torrey Pines Park) explained the historical genesis of City's ownership of, and powers over, Pueblo Lands:

> "The City of San Diego was originally a Spanish, and then a
> Mexican[,] pueblo. The lands in question were a portion of the
> 'Pueblo Lands' of the original town. Under the Spanish and Mexican
> law these 'Pueblo Lands' were held in trust by the pueblo for the
> benefit of the community and could only be used and disposed of in

---

[15] SOHO's petition for writ of mandate alleged City violated CEQA, and SOHO's notice of cross-appeal (as well as Committee's opening brief) purports to appeal from the trial court's judgment insofar as it denied the cause of action alleging City failed to comply with CEQA. However, SOHO provides neither argument nor authority in its cross-appellant's opening brief demonstrating that the trial court erred when it denied SOHO's CEQA claim, and we therefore deem that claim abandoned. (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 684-685; *Brown v. Professional Community Management, Inc.* (2005) 127 Cal.App.4th 532, 537.)

32

accordance with the order and direction of the king or sovereign power. [Citations.] The pueblo of San Diego was incorporated as the City of San Diego in 1850, the pueblo lands here involved being recognized as owned by the city . . . . Thereafter they were held by the city under the trusts attaching to them as pueblo lands, their use and disposition being subject to the control of the legislature as successor to the sovereign power of the king [citations], except the power of 'rent, sale or lease', which was expressly given to the city. In 1872 the legislature passed an act . . . authorizing the city to 'provide for the use, care, custody and regulation of all the commons, parks, cemeteries and property, both real and personal, belonging to the city,' restricting its power only as to the manner of sale and disposition. (Stats. 1871-72, p. 285.) [¶] It will thus be seen that as early as 1872 the legislature had delegated to the city the unrestricted power of determining how its real property should be used." (*Olmstead,* at p. 16.)

Thus, when City was incorporated in 1850, it became the owner of pueblo lands. However, City went bankrupt in 1852, and the California Legislature repealed the then-existing City charter and created a board of trustees, with the California Legislature retaining the power to approve and ratify decisions made by the board of trustees. In 1868, the board of trustees adopted a resolution to set aside certain pueblo lands as a park, and in 1870, the California Legislature approved and ratified that resolution with the 1870 Statute.

Two years later, however, the California Legislature adopted a statute reincorporating San Diego as a city. (Stats. 1871-1872, ch. CCXXI, pp. 285-295.) As part of that incorporation, the California Legislature conferred on City numerous municipal powers, including the right to "provide for the use, care, custody, and regulation of all the commons, parks, cemeteries, and property, both real and personal, belonging to the city." (*Id*. at § 3, p. 286.) These broad powers were reaffirmed in 1889,

33

when the California Legislature approved the charter for City. (Stats. 1889, Chapt. XX, p. 643.) The new charter, which "also vested the city with 'all the property rights' belonging to the city under the act of 1872 [and] would seem to be sufficient to include by reference the power to 'provide for the use' of city property as granted in the act of 1872" (*Olmstead, supra*, 124 Cal.App. at p. 17), provided City with the powers to "regulate and control the use of . . . public places for any and all purposes" (Stats. 1889, Chapt. XX, Art. II, ch. II, § 1.2, p. 651), to "provide for . . . inclosing, improving, and regulating public grounds" (*id*. at § 1.13, p. 652), and to "provide for the security, custody, and administration of all property of said city" (*id*. at § 1.37, p. 654). The new charter also provided that "[a]ll parks . . . or other public grounds now open and dedicated to the public use . . . shall be under the control and management of the Board of Public Works, with power to layout, regulate, and improve same, subject to ordinance passed by the Common Council." (Stats. 1889, Chapt. XX, Art. V, ch. VII, § 1, p. 695.)

B. Analysis

We are persuaded, as was the *Olmstead* court, that any purported limitations placed by the 1870 Statute on City's power to manage its parklands was annulled by the later enactments of the California Legislature. In *Olmstead*, the court was first presented with the issue of whether the subject lands could be deemed a park. (*Olmstead*, *supra*, 124 Cal.App. at p. 16.) The appellant argued that, although a city ordinarily has the power to set aside lands for parks, the 1870 Statute showed the California Legislature intended to divest City of that power because the 1870 Statute provided that the pueblo lands were to be set aside as a park, "and none others," would be set aside for park

34

purposes. (*Id*. at p. 18.) *Olmstead* rejected that argument, stating that even "[c]onceding such effect at the date of the statute, [the 1870 Statute] could not in any way limit the authority given to the city by a later act of the Legislature, and any such attempted limitation implied from the statute of 1869 was annulled by the charter of 1889." (*Ibid*.) We agree that, even assuming the 1870 Statute placed some limits on City's powers over its parklands before City's charter was approved, the California Legislature's approval of City's charter superseded those limitations to the extent the 1870 Statute was inconsistent with the powers granted to City by the California Legislature's approval of City's charter.

Those powers granted to City by the charter, including the power to "regulate and control the use of public places for any and all purposes," and to "improv[e] and regulat[e] public grounds," and to "administ[er] all property" owned by City, along with the more specific power (as to all parks) to "layout, regulate, and improve same," grant ample authority to City to approve construction of a parking structure within the Park for which a fee may be levied. A charter city "has inherent authority to control, govern and supervise its own parks" (*Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 468), and " 'has plenary powers with respect to municipal affairs not expressly forbidden to it by the state Constitution or the terms of the charter.' " (*Hiller v. City of Los Angeles* (1961) 197 Cal.App.2d 685, 689.) Thus, a City may construct a parking garage within a dedicated park because that use is not inconsistent with the enjoyment of the public of the land for park purposes. (*City and County of San Francisco v. Linares* (1940) 16 Cal.2d 441, 446.) Indeed, in *Spires v. City of Los Angeles* (1906) 150 Cal. 64, the City of Los Angeles, as successor to the pueblo of Los Angeles, held "Central Park" under a

35

dedication by the public " 'as a public place forever for the enjoyment of the community in general.' " (*Id*. at pp. 65-66.) In approving the use of the land for library purposes and with reference to the words of the dedication, the court stated:

> "This was comprehensive language, and in construing the grant, or rather the extent of the terms of the dedication, no narrow and strict construction should be applied to limit the city in the uses to which the property dedicated may be devoted, as long as they are such as tend to further and promote the enjoyment of the people under the general dedication of the land for their benefit. And that the establishment of a public library, to which the visitors to the park have access, is consistent with such public enjoyment . . . . [¶] As matter of public knowledge, we are aware that the erection of hotels, restaurants, museums, art-galleries, zoological and botanical gardens, conservatories, and the like in public parks is common, and we are not pointed to any authority where it has been regarded as a diversion of the legitimate uses of the park to establish them, but, on the contrary, their establishment has been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit." (*Spires*, at p. 66.)

SOHO, citing the statement in *Mulvey v. Wangenheim* (1913) 23 Cal.App. 268 that "where a grant is made for a specified, limited, and definite purpose, the subject of the grant cannot be used for another and a different purpose" (*id.* at p. 271), asserts that the dedicating language necessarily delimits the uses to which the lands may be used, and therefore any use inconsistent with a "free" park is a violation of the dedicating language. We are unpersuaded by *Mulvey*, for several reasons. First, *Mulvey* did not consider whether the 1870 Statute had been superseded by subsequent acts of the Legislature, and therefore is of limited persuasiveness. Second, it appears the cases relied on by *Mulvey*, for the proposition that analyzing the propriety of a proposed use starts by strictly construing the dedicating language, all involved privately held land conveyed to the

36

municipality in trust for limited purposes. (See *Price v. Thompson* (1871) 48 Mo. 361 [1871 WL 7747 at * 2] ["the original owner of the land . . . recorded a plat . . . and particularly set forth, marked and designated thereon four acres of land as a 'park;' . . . said park, by virtue of said plat, was vested in the town, in trust for the free use of all the inhabitants of the town as a common or public ground, and for no other purpose whatever"]; *Village of Riverside v. Maclean* (1904) 210 Ill. 308, 319-320; *Seward v. City of Orange* (1896) 59 N.J.L. 331, 332.) However, as the court recognized in *Slavich v. Hamilton* (1927) 201 Cal. 299, 303, "[t]he uses to which park property may be devoted depend, to some extent, upon the manner of its acquisition, that is, whether dedicated by the donor, or purchased or condemned by the municipality. *A different construction is placed upon dedications made by individuals from those made by the public. The former are construed strictly according to the terms of the grant, while in the latter cases a less strict construction is adopted.*" Thus, when (as here) the land was owned by a city (as successor to its pueblo) and is held by that city under a dedication by the public as a public place, "no narrow and strict construction should be applied to limit the city in the uses to which the property dedicated may be devoted, as long as they are such as tend to further and promote the enjoyment of the people under the general dedication of the land for their benefit." (*Spires v. City of Los Angeles, supra,* 150 Cal. at p. 66.) We are therefore convinced that *Mulvey* does not aid SOHO's argument that a strict construction of the term "free" must be superimposed when assessing the propriety of City's decision to approve a pay-parking lot.

For the foregoing reasons, we conclude the trial court correctly held that the 1870 Statute did not bar City from approving the Project merely because it contemplated construction of a pay-parking lot.

DISPOSITION

The judgment granting SOHO's petition for a writ of mandate based on City's alleged violation of Municipal Code section 126.0504 is reversed. In all other respects, the judgment is affirmed. Committee is entitled to its costs on appeal.


McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.